ROSE LA POINT *vs.* JAMES M. PENDLETON, *T. T.*

JUNE 24, 1938.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J.  This is a petition under the workmen's compensation act, general laws 1923, chapter 92, and amendments thereto, brought by the widow of an employee of the town of Westerly, to recover compensation for the death of her husband.  Upon the conclusion of the petitioner's case at the hearing in the superior court, the respondent rested

his case and moved that the petition be denied and dismissed. The trial justice reserved decision and later, by rescript, ruled in favor of the respondent. A decree was thereafter entered denying and dismissing the petition. The cause is before this court on the petitioner's appeal from this decree. The only witnesses in this case were the petitioner, Charles B. Moore, a fellow worker of the deceased, and Dr. Michael H. Scanlon. Excluding for the present the testimony of Dr. Scanlon, the important facts are admitted or uncontradicted.

It appears in evidence that the petitioner's husband, who was fifty-seven years old when he died, had been employed for about eight years by the highway department of the town of Westerly. His work was varied, consisting of shoveling, grading and, when necessary, the sawing of trees which had been chopped down in connection with highway maintenance. At the time of his death, about 10 a. m. on December 3, 1935, he and Moore, a man seventy-two years old, were engaged in sawing the trunk of a tree which was on the ground. In doing this work they were using a crosscut saw about six feet in length and six inches in width, with a handle extending upward at each end. They had completed two sawings, starting from the top of the tree, and were on their third cut at the time of the occurrence under consideration. The diameter of the tree at the place of this cut was approximately eighteen inches, and the saw was half way through the tree when they stopped to get their wind. After a rest of five or six minutes, Moore signalled to the deceased to resume sawing and grasped his handle. As the deceased started to take hold of the handle at his end of the saw, he toppled over into the gutter unconscious. He was pronounced dead by the medical examiner who arrived on the scene shortly thereafter.

The petitioner was married to the deceased twelve years. No children were born of the marriage. The deceased died December 3, 1935; the petition in the instant case was filed

with the director of labor February 24, 1936; and the petitioner remarried August 1, 1936. The petitioner testified that no doctor attended the deceased while she was married to him, that his health was "good" just before he died, and that on the morning of his death he left the house for his work in good spirits, after eating a heavy breakfast.

Moore testified to the condition of the saw and the kind of cut that he and the deceased were making just before the latter fell unconscious. His testimony was that the saw was not in "the best of shape" that morning; that it was in "pretty fair shape, nothing extra"; that in sawing it "pulled a little hard" and that this was due to the fact that "it just run off a little to one side, it didn't go straight" in making the cut; and that as the saw had gone down at an angle and the sawing was getting harder they stopped to get their wind.

The medical testimony of Dr. Scanlon has been read by us with special care and will be set out at some length because of its importance in the determination of the controlling issue in this case. Dr. Scanlon, who was the medical examiner for the town of Westerly, testified that when he arrived at the scene he made an examination of the deceased and "made an inquiry." When he was asked in direct examination if he had an opinion as to the cause of death, he answered as follows: A. "Why, as medical examiner the law specifically states what a medical examiner is to do to enable him to ascertain, if possible, the cause of death; and the law specifically states, as a result of due inquiry and an examination he arrives at a conclusion. That is specific in the law." Q. "And did you arrive at a conclusion?" A. "As a result of inquiry and examination." Q. "What examination and inquiry did you make, doctor?" A. "I talked to this man that was just on the stand ahead of me who was working with him, and asked him what occurred just before he died. I talked to the man's wife as to his health previous to the time of death, and I examined the body there, and

then after the clothes were removed, at the undertakers." There was no autopsy.

The death certificate, which was signed by Dr. Scanlon, gave "Over-exercise, with probable myocarditis. Over-taxed heart," as the cause of death, but this certificate was not put in evidence as it apparently contained hearsay statements. Asked for his opinion as to the cause of death independently of what he had stated in the death certificate, the doctor testified that from his *examination and inquiry* death was due to a "heart condition as a result of over-exertion" and that he connected such "disease or injury" to the deceased's occupation because of the information he had received from a fellow workman who he believed told him "the circumstances as they were." (italics ours). Omitting discussion of counsel which is unimportant for our purposes, we find the doctor's testimony in direct examination closing as follows. Q. "And would you describe to the Court what in your opinion did happen to his heart? I mean what—give us some medical picture of what happened to the man's heart from this work, if I make myself clear." A. "Well, I was told that this saw—" Q. "No, just assume that part. Skip that part. You are basing this on your *examination and inquiry*. Now what in your opinion—" A. "Well, in my opinion there was a condition arose in this man's body at that time, as a result of the work, that the muscles of his heart couldn't handle . . . ." (italics ours)

Following some testimony in reference to myocarditis and its causes, the doctor was asked in cross-examination if he could tell from his examination whether the deceased had "any degeneration of the heart, or what his heart condition was", and his answer was: "No, not from the examination. I depended on the history as I got it from his wife and the other people. . . . And I asked the other man, Mr. Moore, if he had ever shown any evidence of weakness when they were sawing or working together before and he said no." The testimony then proceeds as follows: Q. "Why did you

put in (the death certificate) myocarditis?" A.. "Because
from the inquiry and from the circumstances as I learned
them, this man must have been, at the time he went down
and I—if I say something that isn't right you (referring to
counsel for respondent) stop me. I mean the testimony to
me was *different* from what I heard here today—" Q. "Well,
you wouldn't put in a certificate of death that the man died
from probable myocarditis unless you felt it was probable
he died from that?" A. "I considered some *other things* and
my last conclusion was he died from an over-taxed heart
with probable myocarditis." (italics ours)

In redirect examination, after the doctor had expressed
the opinion that a person can have a myocarditis by over-
exertion, the transcript reads as follows: Q. "Now, taking
into consideration their testimony which you have heard,
that this man," etc., the question proceeding to set out the
testimony of these witnesses and also including the doctor's
examination. After considerable discussion as to the form
and contents of this hypothetical question, it was finally
completed and the witness answered: "Well, Judge Frost,
I have already signed the death certificate at the time this
happened, as a result of .things that occurred at that time.
Now, that is in writing at that date. What I mean is no
trusting to memory or anything, and *what I heard today is
to a great degree different and it embarrasses me.* What I
mean, I—that isn't what I had to consider that morning."
The court: "Well, aside from that, Mr. Flynn is now asking
you as an expert, as I understand, your opinion basing your
opinion upon certain facts that he presented, which he
maintains are in evidence." A. *"I can't give an opinion now,
I would have to study it longer."* (italics ours) This ended
the doctor's examination, which closed the case.

Some time later, the trial justice filed a rescript denying
and dismissing the petition. The decree that followed this
decision incorporates his findings of fact. In so far as ma-
terial they are "that the medical examiner gave as a cause

of death a heart condition, the result of over-exertion; that nothing of a fortuitous or unexpected nature had occurred up to the time when the two employees stopped to rest; that there was nothing in the surrounding circumstances or conditions of work that would allow one to characterize them as excessive; that there was nothing abnormal or unusual in the conditions of work or in the work itself; that no causal connection has been shown between the work and the death." These findings of fact by the trial justice are conclusive unless unsupported by legal evidence. *Bernier* v. *Narragansett Electric Co.*, 56 R. I. 438, 441; *Natalia* v. *United Electric Rys. Co.*, 54 R. I. 183.

In arguing the controlling question before us, namely, whether, as a matter of law, the trial justice was in error in his finding as to causal connection, the petitioner contends: first, that unusual conditions in the work of the deceased resulted in over-exertion, "heart condition", and death; and second, "that there was no legal evidence to sustain the finding that there was no causal connection between the death and the work." The burden of establishing causal connection is on the petitioner. Unless there was testimony in behalf of the petitioner tending to show causal connection, either directly or by reasonable inference, the respondent was not required to go forward with evidence tending to deny causal connection. We interpret the petitioner's language above quoted to mean that there was legal evidence of causal connection, which, being uncontradicted, made it erroneous for the trial justice to find that there was no causal connection.

It is because of these contentions that we have found it necessary to quote freely from the transcript, so that the evidence which was actually before the trial justice might more clearly appear. Hereafter, when we refer to the undisputed evidence upon which the trial justice based his findings of fact, we do so only to review his finding on the issue of causal connection.

The two contentions above stated blend into each other and may well be considered together. There would be considerable force in the petitioner's argument if it were supported by legal evidence. Throughout her argument she contends: first, that the collapse of the deceased was due to over-exertion resulting from his working with "a tool improper for the job . . . that the work was unusual . . . that there was an unusual condition in the third cut which did not occur in any other cut and which does not occur in any proper usual or ordinary sawing operation"; and second, that the "only medical testimony says this caused his death." The testimony does not warrant these conclusions.

Assuming, without deciding, that the evidence supports the petitioner in the first of her above-stated contentions, we are of the opinion that there is no legal evidence which requires the conclusion that there was legal evidence of causal connection.

The petitioner in her brief repeatedly says that the only medical testimony in this case is from Dr. Scanlon, and that he gave it as his opinion that LaPoint died from a "heart condition" as the result of over-exertion. Dr. Scanlon's ability and standing as a physician stands unquestioned; but whatever opinion he may have expressed as to the cause of LaPoint's death is not based on the evidence in the case or solely on his conclusions from an examination of the body of the deceased. The petitioner detaches what she urges as Dr. Scanlon's medical opinion in this case from its context, which clearly shows that such opinion was based, to a considerable extent, upon his "inquiry" of the circumstances surrounding LaPoint's death, which he made when it occurred in his capacity as medical examiner. The opinion that he then formed as medical examiner, and which he repeated at the trial, was based upon outside information which, according to his own testimony, was "different" from the testimony he heard at the trial. The doctor's testimony that we have already quoted speaks for itself.

If any inference favorable to the petitioner as to the real cause of LaPoint's death reasonably could be drawn from Dr. Scanlon's testimony, which is the only medical testimony in the case, such inference was entirely destroyed when he refused to answer the hypothetical question from petitioner's counsel, which was based solely on the doctor's examination of LaPoint's body and on the evidence in the case, saying: "I can't give an opinion now. I would have to study it longer." With this answer, counsel for the petitioner closed his case without asking the court for a reasonable continuance, so that Dr. Scanlon might further consider the question or that the petitioner might have an opportunity to secure other competent medical testimony.

On the state of the record before us, we are of the opinion that the trial justice committed no error of law in finding that there was no legal evidence of causal connection. See *Reynolds* v. *Freemason's Hall Co.*, 60 R. I. 343, 198 A. 553; *Bernier* v. *Narragansett Electric Co.*, *supra*. In this view of the case, it becomes unnecessary for us to consider the authorities which the petitioner cites in her brief. For the same reason, we need not consider her further contention that she is entitled to full compensation under the statute as amended, notwithstanding her remarriage.

The petitioner's appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*Tillinghast, Morrissey & Flynn, M. Walter Flynn, John M. Dunn,* for petitioner.

*Henry M. Boss,* for respondent.