Ivy E. Barker *et al. vs.* Narragansett Racing
Association, Inc.

NOVEMBER 27, 1940.

REARGUMENT DENIED DECEMBER 16, 1940.

Present: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J.  This is a petition brought under the workmen's compensation act, general laws 1938, chapter 300, by Ivy E. Barker, for herself and in behalf of her minor child, Walter E. Barker, Jr., for compensation alleged by her to be due from the respondent on account of the death of said Ivy E. Barker's husband, Walter E. Barker, by accident arising

out of and in the course of his employment in the service of the respondent.

The petition was heard before a justice of the superior court, who ordered the entry of a decree in favor of the petitioners. This decree contains, among others, the following findings of fact. (1) That on July 7, 1939, Walter E. Barker, while employed as chief electrician, charged with the duty of installing, repairing and directing the general upkeep of the electrical plant and equipment at the race track of the respondent in Pawtucket, "received personal injury, by accident, arising out of and in the course of his said employment, resulting in the death of said employee, to wit: on the 7th day of July, 1939." (2) "That the cause of said accident, resulting in death as aforesaid, was acute myocarditis induced by excessive heat condition and overexertion as a contributing factor." (3) "That at the time of said accident, and for some considerable period of time prior thereto said employee was engaged in performing rigorous work for said employer in a small three-walled compartment, without windows, and in excessive heat and under conditions not common to his fellow-employees or to the community in general."

With the exception of the testimony of the medical examiner, Dr. Thaddeus A. Krolicki, the evidence is undisputed. It shows that on the day of his injury and death, Barker was installing and making ready for use certain electrical equipment and appliances in the grandstand, a large structure of steel and cement or concrete construction. It is enclosed on three sides; the fourth side, which looks out onto the track, is open. Seats for thousands of spectators are arranged in tiers for the entire length of the grandstand. In the rear of the last tier of seats is a mezzanine, so called, with various offices and a track police room. A steel-framed roof covers the grandstand, including the mezzanine. It is "not insulated" and has a number of fixed glass skylights in that portion of the roof over the mezzanine.

At one end of the mezzanine there is a small box-like compartment, without windows, in which is located an "odds board". Herbert W. C. Pearce, the carpenter-foreman, testified that admission to this compartment, which, starting from the roof, extends downward and has its floor within seven or eight feet from the floor of the mezzanine, is had from "a small vestibule running off one of the partitions and we climbed a ladder and got in that way." The space between the floor of the mezzanine and the floor of the "odds board" compartment forms a three-wall enclosure or "niche", also without windows, which was to be utilized for a concession stand.

It appears in evidence that up to noon of July 7, 1939, Barker worked a good deal of the time from a stepladder, boring holes in large timbers when necessary, close to the roof of the mezzanine proper and police room; and that he also worked in and about the small compartment of the "odds board" and in the three-wall space or "niche" under that compartment, where a concession stand was to be located. While on other days he had been assisted by another electrician, on this particular day his helper was an unskilled laborer, who could merely hand him tools or material.

Following a half hour for lunch, Barker resumed his work at 12:30 o'clock on the mezzanine floor and in the space under the "odds board". He worked there for almost an hour when he came down the stepladder from which he had been boring holes, with a bit and brace, in the beams under the floor of the "odds board" to carry a BX electrical cable. Mopping the perspiration from his brow, he said that "he felt kind of funny" and started to get a drink of water, when suddenly he called for "Air, air. Get some air." The laborer who had been working with him testified that then Barker "just buckled at the knees, kind of weakened"; that he, the laborer, with the help of another workman carried him "out to the top stairway outdoors" where "he seemed to collapse entirely." From there they carried him downstairs to the

administration building, where Barker died before medical aid could reach him.

July 7, 1939 was a very sultry day in a heat wave of several days' duration, the temperature in Providence, where the United States weather bureau station is located, ranging from 83 to 90 degrees. There is testimony to the effect that it was extremely hot outside the grandstand and hotter on the mezzanine floor, where the steel and glass of the roof attracted and held the heat during the protracted heat spell. Pearce, the carpenter-foreman, who was working in the police room, testified that it was so hot in that room that he "was willing to go home at any time. Other than I hadn't been paid, I probably would have gone home. . . . That was pay day. . . . I'd rather stay at the track and get my pay than go home and turn around and come back." Asked if it was hotter in the enclosure under the "odds board", where he had worked earlier in the day, than it was out in the mezzanine floor, Pearce's answer was: "Yes, we did manage to get a little air out, ten to twelve foot away from that opening, than we did inside that enclosure." What the condition was inside the compartment containing the "odds board", where only Barker worked late that forenoon, is left to inference from the other testimony on this point.

Barker was admittedly a conscientious worker, who had not lost a day from his work during the five years that he had been employed at the track. There is no evidence of any kind, direct or by inference, that he had ever been afflicted by any heart condition prior to the day of his death. Doctor Thaddeus A. Krolicki, the medical examiner, testified in direct examination that, as a result of his examination of Barker's body, he was of the opinion that death was caused by "acute myocarditis probably induced by overexertion and excessive heat." No objection was interposed to the question that elicited this answer, and no request to strike out such answer or any part thereof was made in behalf of the re-

spondent. The opinion thus expressed by Dr. Krolicki stands as competent evidence in this cause. Furthermore, the respondent produced no medical testimony to deny or contradict such evidence.

Immediately following the above-mentioned evidence by Dr. Krolicki, he was asked by counsel for the petitioners if he made the same statement as to the cause of death in the death certificate signed by him. The answer being in the affirmative, the certificate was offered in evidence. Respondent's counsel thereupon objected, on the ground that other testimony from the doctor showed that such statement *in the certificate* was based, at least in part, upon hearsay. After some discussion, counsel for the respondent moved that "the question and its admissibility be reserved until I have had an opportunity to cross-examine the doctor." The trial justice, however, received the certificate in evidence *"de bene"*, noting the respondent's objection in the form of an exception which is before this court by virtue of the fifth reason of appeal.

At the conclusion of the doctor's examination, we find respondent's counsel speaking as follows: "Your Honor please, I would like to resume my motion—I have cross-examined the Doctor,—that the testimony be stricken from the record. The Court: I will deny the motion and note your exception." This objection in the form of an exception is before this court by virtue of the sixth reason of appeal. In these circumstances, even if we assume that there was error in receiving the certificate in evidence, in its entirety, such error was not prejudicial to the respondent, for the same medical opinion as to the cause of death and its probable origin that was stated in the certificate was already in evidence, without objection from the respondent. This situation is quite different from the one in *LaPoint* v. *Pendleton,* 61 R. I. 121, where the doctor refused to give an opinion as to the cause of death either from his examination of the

body of the deceased or upon the evidence in the case. The respondent takes nothing by its fifth and sixth reasons of appeal.

The respondent next contends that in this case there is no legal evidence of an "accident" within the meaning of the workmen's compensation act. We have heretofore held that to constitute an accident under the act there must be some unlooked-for mishap or an untoward event which is not expected or designed. *Chirico* v. *Kappler*, 61 R. I. 128; *Walsh* v. *River Spinning Co.*, 41 R. I. 490. An injury by accident to the physical structure of the body need not be the result of external violence but may result internally from overexertion or excessive heat. *Mederos* v. *McLeod*, 65 R. I. 177, 14 A. 2d. 22; *Walsh* v. *River Spinning Co.*, *supra*.

The respondent further contends that there is "no testimony of unusual and excessive heat *warranting* the finding that the deceased received a personal injury by accident arising out of his employment." (italics ours) If by such language the respondent means that we should weigh evidence which, when fairly considered, is susceptible of different reasonable inferences, we cannot agree with its contention. A conclusion by way of reasonable inference from the evidence is a finding of fact. The character of such an inference in a compensation case was considered by this court in *Jillson* v. *Ross*, 38 R. I. 145. At page 148 of that opinion, the court says: "In proceedings under this statute the questions whether an injury to a workman, resulting in his death, arose out of and in the course of his employment are material issues in the case. It must frequently happen that these questions can be determined only by inferences reasonably to be drawn from other facts directly proved. The determination of each of these issues is a finding of fact within the meaning of the statute, although it may be merely a conclusion deduced from other facts; . . . ."

If a justice of the superior court determines the above-mentioned issues upon inferences reasonably to be drawn

from the evidence, then his findings on such issues are conclusive upon us, even though we might think that different inferences should have been drawn. Power to determine questions of fact is placed solely in the superior court by the workmen's compensation act. We will examine the evidence in compensation cases to determine only whether or not the findings of fact by a justice of that court are supported by legally competent evidence, direct, circumstantial, or by reasonable inference. If such findings are so supported, we cannot disturb his findings; but if they are not so supported, then there is an error of law which warrants our interference.

By the quoted language in the contention above set forth, the respondent probably means to urge that there is no legally competent evidence to support the findings of fact of the trial justice. This calls upon us to examine the evidence for the purpose and to the extent just indicated.

In the peculiar circumstances of the instant case, the controlling consideration is whether excessive heat, combined with overexertion, due to conditions and manner of labor not usual to the workman in the ordinary course of his employment, resulted in his injury and death. The respondent argues that Barker, when stricken, was engaged in doing his ordinary work under a heat condition which was common to the whole community. Even if this view were reasonable, still the evidence before us is reasonably susceptible to the following different and opposite conclusions. First, that while Barker at the time of his injury was engaged in doing his ordinary work, meaning the work of an electrician, he was not then engaged, nor had he been engaged for a considerable time prior thereto, in doing such work in the manner and under conditions that usually existed in the ordinary course of his employment, and no other workman at that place was working under those same conditions. Secondly, that while the heat condition in a sense may have been common to the whole community, yet that heat condi-

tion was intensified and thereby rendered excessive by the manner and in the places in which Barker had been and was actually working when stricken.

In this view of the evidence, the untoward event which broke down Barker's physical stamina and resulted in his death was the aggregate of the unusual manner, places and atmospheric conditions in which he, and he alone, was working on that day. The evidence before us being reasonably open to such interpretation, which the trial justice apparently adopted, there was legally competent evidence in this case to support his findings of fact. In these circumstances, we cannot disturb his findings.

The respondent has cited the four following Pennsylvania cases in support of its contention that the injury to Barker should not be deemed an accident in the course of employment. In *Maas* v. *Otis Elevator Co.*, 140 Pa. Super. 33, 12 A. 2d. 814, a workman, with his tool box on his arm, climbed to the roof of a building by means of a fourteen foot ladder to make a routine inspection of an elevator, as he had done as part of his work for many years. This occurred early in the day in the month of August. In denying compensation the court says: ". . . there was no proof that it was unusually hot. . . . The combination of circumstances referred to by the board was a combination that would occur on practically any inspection made during the summer months; there was nothing unusual."

In *Pirillo* v. *Barber Asphalt Co.*, 140 Pa. Super. 334, 13 A. 2d. 906, the court says: "The work which decedent was doing was common labor of the same kind performed by him during all of the former periods of employment with defendant and was done in the same manner." The court denied compensation on the ground that "the record is barren of evidence of an accident or of an injury." In *Palinski* v. *State Workmen's Ins. Fund,* 140 Pa. Super. 522, 14 A. 2d. 347, compensation was denied to a claimant who was doing

his usual work in the same manner and under the general conditions ordinarily prevailing.

In the very recent case of *Nolker* v. *Ford Collieries Co.,* Pa. Super., 15 A. 2d. 557, the decedent, a miner, had been suffering from and under medical treatment for a serious heart ailment, at least since 1934, which had progressed to the stage where victims are "frequently found dead in bed." He suddenly collapsed and died of "acute cardiac failure" while pushing an empty coal car in the same manner that he had been doing for years. The court, finding no evidence in the record of any unusual or sudden exertion, denied compensation because of lack of proof of any accident in the course of employment. All four cases are readily distinguishable from the instant case.

The respondent's appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

---

PER CURIAM. Following our opinion of November 27, 1940, the respondent filed a motion for a reargument in this cause and contends that the direct testimony of Dr. Krolicki, that Barker died of "acute myocarditis probably induced from overexertion and heat", being based upon a question calling for the doctor's opinion from his examination of the body, did not presuppose hearsay, and therefore was not properly subject to a motion to strike out; that the answer of Dr. Krolicki, so far as it related to a diagnosis of overexertion and excessive heat, was incredible; and that therefore there was no legally competent evidence of causal connection between death and "accident".

In so contending, the respondent apparently assumes that if the conclusion in the above-quoted testimony as to what "probably induced" the acute myocarditis were not in evi-

dence, the decision of this court must and would have been in favor of the respondent. This shows a misconception of our opinion. That part of Dr. Krolicki's answer just mentioned was not the basis of our decision. It was specifically mentioned solely in connection with our consideration of respondent's exception to the admission in evidence of the death certificate, which, in the circumstances, was held to be harmless error.

Doctor Krolicki viewed Barker's body and decided that his death was due to acute myocarditis. This was clearly competent medical testimony. In the course of his testimony he further stated that overexertion is one of the causes that results in acute myocarditis. This also was competent medical testimony. Furthermore, it is undisputed that Barker had never suffered from any heart ailment. With these facts and other circumstances in evidence, the real question before us was not whether Dr. Krolicki supposed or believed that the acute myocarditis was "probably induced from overexertion and heat", but whether, in the peculiar facts and circumstances in evidence and the reasonable inferences therefrom, there was legally competent evidence to support the finding of fact by the trial justice that the acute myocarditis resulting in Barker's death was due to excessive heat and overexertion. In other words, our determination that there was evidence of causal connection between the "accident" and Barker's death was rested by us on all the evidence in the cause and not on any mere conclusion of Dr. Krolicki as to what "probably induced" the acute myocarditis.

It was for this reason that we set out the unusual facts and circumstances in evidence in this cause with considerable detail, and that we further stated that it was within the province of the trial justice to draw all reasonable inferences from established facts and other credible evidence. Upon our consideration of the evidence, we expressed the opinion

**500**

that the view taken by the trial justice of the unusual factual situation in this cause was supported by legally competent evidence and said: "In this view of the evidence, the untoward event which broke down Barker's physical stamina and resulted in his death was the aggregate of the unusual manner, places and atmospheric conditions in which he, and he alone, was working on that day."

For the reasons stated, the motion for reargument is denied.