### LIBERTY MUT. INS. CO. v. HUGHES et al.

No. 4727.

Court of Civil Appeals of Texas. Beaumont.

March 15, 1951.

Rehearing Denied April 25, 1951.

Vinson, Elkins & Weems, Houston, Pitts & Liles, Conroe, for appellant.

Helm & Jones and Clarence M. Wilchar, Jr., Houston, for appellees.

R. L. MURRAY, Justice.

This is a Workmen's Compensation case in which Mrs. Delma Camille Sales Hughes, widow of Sam Sales, deceased, and her minor son, Jerry Lee Sales, sought to recover judgment against the Liberty Mutual Insurance Company, appellant, for compensation benefits because of the death of Sam Sales. Judgment was rendered on the verdict of a jury after motions by the appellant for instructed verdict, judgment non obstante veredicto and for a new trial were overruled.

The first five points of the appellant attack in various ways the sufficiency of the evidence. In its first point it says that the trial court erred in not instructing a verdict in its favor, since there was no evidence raising an issue of fact that the fatal injuries sustained by the deceased Sales were received in the course and scope of his employment with the Standard Oil Company of Kansas. By its second point, it contends that the trial court erred in not granting its motion for judgment non obstante veredicto, since the evidence failed to present any question of fact for the determination of the jury that the fatal injuries received by the deceased Sales were received in the course and scope of his employment. By its third point it says the trial court erred in not granting it a new trial on the ground that the findings of the jury that the deceased's death was from accidental injuries sustained in the course of his employment were against the great weight and preponderance of the evidence. By its fourth point it contends it should have been granted a new trial on the ground that the findings of the jury that the fatal injuries of the deceased were not because of personal reasons to Tom Shelton and not directed against the deceased as an employee or because of his employment were against the great weight and preponderance of the evidence. By its fifth point it says it should have been granted a new trial on the ground that the findings of the jury that the fatal injuries to the deceased were not caused by his willful intention and

attempt to unlawfully injure Tom Shelton or the wife of Tom Shelton were against the great weight and preponderance of the evidence. Since all of these points are concerned with the evidence and the sufficiency, weight and preponderance thereof, they will be considered together.

On July 27, 1948, Sam Sales was killed by Tom Shelton with a knife on the premises of the Standard Oil Company of Kansas, the premises where both men worked, near Conroe in Montgomery County, Texas. Sales was the husband of Mrs. Hughes, one of the appellees, and the father of Jerry Lee Sales, the other appellee. Sales was 45 years of age at the time of his death, weighed between 165 and 185 pounds and was approximately six feet tall. He died as the result of eleven knife wounds, three of which were large. The wounds were on the right chest, left chest, right collar bone, base of the neck, left cheek, left upper portion of the abdomen, left groin, right knee, lower back and left side of the back six inches below the shoulder. Tom Shelton, the man who killed him in the fight, was 48 or 49 years of age, weighed 210 pounds and was 6 feet, 1 inch tall. Both men were employed by the Standard Oil Company of Kansas and in their employment operated three oil production leases in the Conroe oil field. The employer maintained three residences on one of its leases, known as the Smith-Ratcliff lease, which it furnished rent free to its employees. The third man who helped them work the leases, Wiggins, lived in his own house near the company's property line some 200 or 300 feet from the third company house, which was occupied by one R.L. George. Mr. George was the Field Superintendent for the company, but spent only about one-half of his time at this location. Sales was employed by the company in 1938 and Shelton in January, 1944, and Wiggins in June, 1944. All three men were employed as pumpers or gaugers on the three leases and did general maintenane work and cared for, maintained and operated tanks, wells and chemical feeders. The three men worked in two shifts, one beginning at 7 o'clock a.m. and ending at 3 p.m., the other beginning at 3 p.m. and ending at 11 p.m. Sales and Shelton worked these two shifts. Wiggins was a relief man, helping both Sales and Shelton during both portions of their shifts and relieved the men on the days they were not due to work.

At the time of Mr. Sales' death Wiggins was away on vacation and Sales and Shelton worked changed shifts; one worked from 6 o'clock a.m. to 12 noon and the other from 12 to 6 p.m. During that week Sales worked the morning shift and Shelton was working the afternoon shift.

The three leases operated by the company were separated from each other and the men made the rounds of the various properties of their employer in a Ford pickup truck provided by the company. The truck was also used to obtain supplies and transport tools. The truck was ordinarily used in performing their duties but all of the employees, including Sales, had used the truck on personal missions without objection from Mr. George, the Field Superintendent, or Mr. Hodges, who was Superintendent of Production for the company and lived in Houston. Mrs. Hughes, the appellee, testified that Sales was called "lead-off man," took care of the supplies and bills and looked after the maintenance and upkeep of the pickup truck; that Sales had assumed the responsibility of giving orders to Shelton; that at times he had gone out on a lease and cleaned up tanks that had overflowed, and had heard him complain to Shelton about tanks overflowing. She saw a letter from Mr. Hodges, the company's general superintendent of production, to Sales complaining of there being too much mileage on the company's truck, that they would have to cut it down; that she had heard arguments between the two men over mail that was there at the field office and which was opened by one and not the other. She had heard an argument between Sales and Shelton because Shelton had used the truck at night and permitted it to run out of gasoline and the next day Sales would have to walk for gas for the truck. Jerry Lee Sales the other appellee, testified that his father checked the company leases and equipment on the evenings before retiring, whether on duty or not and had on oc-

casions worked at night and at times was called on the telephone at night and went out where the tanks had overflowed. Sales and Shelton had had many differences over personal matters also and their wives had had a falling out over a lodge matter. Sales and his wife had been to Houston to talk to the General Superintendent in an unsuccessful effort to have Shelton transferred away to some other locality. In July of 1947, Mr. Hodges, the General Superintendent, had a conference at the office on the company lease with Sales, Shelton and Wiggins, and according to Mrs. Hughes, the appellee, after this conference there was no more trouble between the men until the night of the killing. Mr. Hodges testified that in that conference he told Shelton and Sales that they would have to straighten out their private affairs or some one would have to leave. At this conference he also designated Sales as lead-off man; said that by that he meant Sales should pick up the mail at the post office, see that the mail went away each day, buy such small supplies as were necessary and be the contact man to call Mr. George when he was away if anything arose requiring him to go; he did not tell Sales that he would be in charge of the truck or would be responsible for the premises, equipment or anything else. One J.A. Stidham, testifying as an expert who had worked in the oil fields of Texas since 1916, testified that "a lead-off man is a fellow out on a lease who has other men working with him and under him; that the lead-off man is responsible to the official above him as to what they do out on a lease and if there were two of them there is one who has more authority * * *. If there was just two men working on the lease the lead-off man is responsible for that lease and is also responsible for the maintenance and and upkeep of the equipment and of the safety of the lease." This testimony was admitted over the objection of the appellant, which objection is considered further under appellant's Point No. 12.

Sales was killed on the company's property about midway between the Sales and Shelton houses and about 50 or 60 feet from the company garage some time after 10:30 p.m. On the evening of the killing Mr. and Mrs. Shelton went to a baseball game in Conroe in the company pickup truck. Sales and Mrs. Sales (now Mrs. Hughes, the appellee) attended the same game in their personal car. They saw the Sheltons at the ball game but did not talk to them. The ball game was over at about 10:30 p.m. and immediately thereafter both men drove back to the Smith-Ratcliff lease. The lease was about half a mile from the Conroe-New Caney, or Splendora, paved highway and the road from this highway to the lease was a dirt road approximately 15 or 16 feet wide and was dry and dusty on that night. After the Sales had been on this dusty road about 100 yards they came up with the Sheltons in the company pickup truck. Mrs. Hughes testified that Sales thereupon remarked "there he is in the company pickup and I will go down and see about it"; that he then undertook to pass them on that road and did pass them; that while the Sales were behind the truck Mrs. Shelton looked back in the rear glass and saw the Sales and then Shelton pulled the truck into the middle of the road and then Sales honked the second time; Shelton stayed in the middle of the road and Sales passed on, on the beaten path in the middle of the road where it was used so much; as soon as Sales got past Shelton he got back in front of Shelton where his car threw dust back on the Sheltons. When the Sales got to the company premises they drove in the garage, got out of the car and she started towards her house; she did not see the Sheltons put the truck in the company garage but saw the lights of the truck in the garage. After she started into her house she heard Mrs. Shelton cursing them and also heard her say "she made him do it." Mrs. Sales then went into her house to get her son Jerry to get Sales because she thought there would be trouble. She did not hear any words that were passed between Shelton and Sales and the next thing she knew was when Sales came toward their house, saying to her, "Johnnie, Tom got me." He was very bloody. She sent her son Jerry to Wiggins for assistance; Sales was taken to the hospital a few minutes later, where he died. Mrs. Hughes

admitted making a written statement to Mr. Hodges the superintendent, and an attorney for the company the next day after the killing. This statement is in evidence and in it, among other things, she stated she did not know what the trouble was between Sales and Shelton unless it was jealousy.

. The appellant, in its brief under its first and second points, set out excerpts from the testimony of Shelton and Mrs. Shelton concerning the events leading up to the killing. According to them, the car driven by Sales passed by them at a high rate of speed and they had to go into a ditch to avoid a collision and when the car cut in front of them it threw sand and dust on them. According to their testimony Sales got out of his car, came over toward the Shelton house cursing Mrs. Shelton and Shelton asked him to stop; Sales then cursed him and said "I will kill you" and jumped on Shelton, hit him then the two of them fought together, fell to the ground with Sales on top and choking Shelton, and Shelton then got his knife out of his pocket and cut him because he was afraid for his life. Mrs. Shelton also testified that when she heard Sales cursing them she said "It looks like you have done enough by trying to push us in a ditch." The sheriff of Montgomery County testified as to the location of the various houses and buildings on the company premises and also located on the ground what was apparently the scene of the fight. He located it by a bloody package of cigarettes and a hole in the ground indicating a big tussle. This point was 50 or 60 feet from the company garage and 125 feet from the Sales fence, about 30 feet from the Sales house and 111 feet from the Shelton house. The gist of his testimony about distances and directions is that a direct line from the Sales garage to the company garage where the pickup truck was kept would pass somewhat to the northeast of the point he located as the place of the fight. The appellant argues that the appellees, by their testimony, wholly failed to establish by a preponderance of the evidence that the fatal injuries received by Sales originated in the work he was employed to perform for the Standard Oil Company of Kansas. It cites and relies

upon American General Insurance Co. v. Williams, Tex.Sup., 227 S.W.2d 788; Ætna Life Insurance Co. v. Burnett, Tex.Com.App., 283 S.W. 783; Richardson v. Texas Employers' Insurance Ass'n, Tex. Civ. App., 46 S.W.2d 439; Erwin v. Texas Employers' Insurance Ass'n, Tex.Civ.App., 63 S.W.2d 1076; New Amsterdam Casualty Co. v. Collins, Tex.Civ.App., 289 S.W. 701; Texas Employers' Insurance Ass'n v. Bailey, Tex.Civ.App., 266 S.W. 192.

It further argues that if the evidence in this case in its entirety leaves the inference of fact equally consistent and probable with the theory that the fatal injuries to Sales did not originate in the business of his employer as with the theory that such injuries had to do with and originated in its work, trade, business or profession, then the appellees failed to discharge the burden of proof upon them. In support of this proposition, it cites and quotes from Comet Motor Freight Lines v. Holmes, Tex.Civ. App., 203 S.W.2d 233; Texas-Pacific fidelity & Surety Co. v. Hall, Tex.Civ.App. 101 S.W.2d 1050; Texas Employers Insurance Ass'n v. Wilkerson, Tex.Civ.App., 199 S.W.2d 288; Texas Employers Insurance Ass'n v. Young, Tex.Civ.App., 231 S.W.2d 483.

It further points out the elementary rule of law that one presumption of fact cannot rest upon another fact presumed. It argues that the immediate difficulty here between Sales and Shelton is conclusively shown by the evidence to have been the occurence on the dusty highway immediately before they reached the company premises; that Sales was angered by Shelton's manner of driving there, went from his own garage to Shelton's house with the intent to start a difficulty with him because of such driving and in making an unlawful assault upon Shelton, and with that end in view he was killed. It further argues that even though it should be conceded that the fatal fight occurred because Sales attempted to see Shelton about the use of the pickup truck, still the undisputed evidence shows that Sales was not actually in the course and scope of his employment in doing so since, as it contends, the testimony is undisputed that under Sales' contract of employment he was

not in charge of the equipment and had no control or supervision of Shelton. It says that all employees used the pickup truck for personal matters with the permission of George, the Field Superintendent, and therefore Sales knew that Shelton had the right to use the truck that evening to go to the ball game and any act on his part in attempting to interfere with or protest against such use was beyond the course and scope of his employment.

■ We do not agree with these contentions and appellant's first five points are overruled. The testimony of Shelton and his wife in regard to the incidents which immediately preceded the killing of Sales is not conclusive and the jury was not bound to accept it as true. Shelton, of course, is the only surviving witness as to the events which transpired immediately before he killed Sales. The courts recognize that a witness testifying under such conditions had, as every one has, social and economic interests in being thought innocent. See: Maryland Casualty Co. v. Cardillo, 69 App.D.C. 199; 99 F.2d 432; Associated Employers Lloyds v. Groce, Tex.Civ.App., 194 S.W.2d 103. Here the jury was authorized to consider the fact that he, Shelton, was the person who did the slaying, and also the probable truthfulness of his testimony that he got his knife out of his pocket while he was on the ground under Sales; that he opened it while Sales was holding his throat and that Sales made the statement to him, after cursing him, that he was going to kill him, with no preliminary remarks or blows. The jury also could consider the number of wounds upon Sales' body and their location. The testimony of Mrs. Hughes, which we have summarized above, presented to the jury the evidence that the Superintendent of Production of the employer had written a letter to Sales complaining that there was too much mileage on the company truck and also the evidence that when Sales saw Shelton driving home in the company truck, a few minutes before the killing, and said, "There he is in the company pickup and I will go down and see about it." These portions of the evidence, when considered together with all the other evidence, support the conclusion

and inference that Sales went over to remonstrate with Shelton about his use of the company truck that night, or to investigate the truck's readiness for his own use on the following morning, or to see about the fitness of the truck for its further use by him that night. If this or any of these was the purpose of Sales going over to talk to Shelton then such action on his part was in the furtherance of his employer's business and within the scope of his employment. It was not necessary in order that Sales' death be compensable that he should have been killed during the hours for which he was actually paid for working. Hartford Accident & Indemnity Co. v. Bond, Tex.Civ.App., 199 S.W.2d 293; Liberty Mutual Insurance Co. v. Nelson, 142 Tex. 370, 178 S.W.2d 514.

■ Appellant's 6th and 7th points complain of the action of the trial court in refusing to include in its charge additional definitions and Special Issues requested by the appellant. The first two of such requests would have added to the court's definition of "course of employment" that an injury is not sustained in the course of employment if received while on a private mission, and that an injury is not sustained in the course of employment if the employee is injured while engaged in an act forbidden by his contract of employment. On the authority of Maryland Casualty Co. v. Wilson, Tex.Civ.App., 108 S.W.2d 260, we overrule points 6 and 7 and hold that it was not error for the court to refuse to give the instructions requested, since the definition given by the court was in accordance with the statute and the two requested definitions were simply negative statements of the statutory definition.

■ The two requested issues refused by the court and complained of in appellant's 8th and 9th points would have inquired of the jury whether the difficulty between Sales and Shelton arose because Sales was attempting to find out about the pickup truck and the use of it by Shelton, whether such attempt was the producing cause of Sales' death and whether Sales was acting beyond the course and scope of his employment in so doing, and whether the

manner in which Sales and Shelton drove their cars on the road immediately before and at the time Sales passed Shelton was the producing cause of the death of Sales. We believe that these issues all inquired as to evidentiary matters and it was not necessary for the trial court to submit such issues in its charge. Maryland Casualty Co. v. Wilson, Tex.Civ.App., 108 S.W.2d 260; Federal Underwriters Exchange v. Morton, Tex.Civ.App., 167 S.W.2d 267.

Appellant's 10th point complains of the action of the trial court in overruling its challenge for cause of a prospective juror, one Otto Pate, and says the court thereby forced it to expend one of its challenges on this prospective juror and thus was deprived of its right to strike the name of the juror Hart. It states that Hart was objectionable, but gave no further reason why Hart was objectionable as a juror. We have examined the testimony of venireman Pate on his voir dire examination and are satisfied that the trial court did not abuse his discretion in determining that Pate was a qualified juror. The trial court's action in the exercise of its discretion in such a matter ought not to be revised on appeal unless it be made clear that thereby the party complaining has been deprived of a trial by a fair and impartial jury. No such fact appears in this case and this point is overruled.

Appellant's 11th point deals with its objection to the testimony of Mrs. Sales, now Mrs. Hughes, that her husband said while they were riding in their car on the way home a few minutes before his death that he saw Shelton in the company pickup and would go and see about it. A similar statement was held admissible as res gestae in Liberty Mutual Ins. Co. v. Nelson, 142 Tex. 370, 178 S.W.2d 514, and on that authority the point is overruled. See, also, Hartford Accident & Indemnity Co. v. Bond Tex.Civ.App., 199 S.W.2d 293.

By its 12th point, appellant complains of the trial court's action in admitting in evidence the testimony of the witness Stidham, who testified that there was a well accepted and generally recognized meaning of the phrase "Lead-off man" in the oil production business in that locality. If the terms and conditions of hiring contract between Sales and his employer had been shown to be clear and unambiguous as to his duties as lead-off man, we think the appellant's objection would be sound and should have been sustained. From the evidence, however, we are not satisfied that such hiring agreement was clear and unambiguous as to his duties and therefore evidence of custom in the particular trade or business became admissible. In Hartford Accident & Indemnity Co. v. Bond, supra, witnesses were permitted to testify that it was the general custom in the oil field for a member of the drilling crew to notify his driller that he was not going to work the next tower, or shift. We think this is authority in support of the trial court's action here.

The next seven points, 13 to 19, inclusive, complain of various portions of the argument of counsel to the jury. The 20th point complains of all the argument taken together and says that they were such as to require a reversal under the holding in the case of Smerke v. Office Equipment Co., 138 Tex. 236, 158 S.W.2d 302. We have examined all of the arguments complained of and find them singularly free from objectionable features which often find their way into a great many jury arguments. There is no vilification of attorneys or witness or parties, no appeals to emotion or prejudice. The portions of the argument complained of relate to quotations from the testimony and inferences and deductions counsel made therefrom. Two portions of the argument complained of are considered by the appellant to be improper because they inform the jury of the effect of their answers to the issues. We do not find the argument complained of subject to this criticism. We think the trial court's rulings on the objections made to the argument were correct and all of the points in regard to the argument are overruled.

The judgment of the trial court is affirmed.