277 P.2d 542

Norman Edward LEMON, Claimant-
Appellant,

v.

MORRISON–KNUDSEN CO., Inc., an Idaho
Corporation, Employer,

Mountain States Mutual Casualty Co., Inc.,
a New Mexico Corporation, Insurer,
Defendants-Appellees.

No. 5782.

Supreme Court of New Mexico.

Dec. 6, 1954.

W. T. O'Sullivan and Heister H. Drum, Albuquerque, for appellant.

Simms & Modrall and James E. Sperling, Albuquerque, for appellees.

McGHEE, Chief Justice.

This appeal is taken by claimant from an order dismissing his claim for workmen's compensation. Motion to dismiss the claim was made by the defendants, employer and insurer, at the close of claimant's case, on the ground a consent judgment entered upon an earlier workmen's compensation claim made by claimant against defendants was given for the same disability of which claimant now complains, or that the claim is barred under the principle of res judicata.

The facts of the case, viewed in the light most favorable to the claimant, are as follows:

Claimant was employed by the Morrison-Knudsen Co., Inc., on November 17, 1951, as an operating engineer and mechanic to work on the Jemez Dam Project. He worked his first day November 18, 1951. On that day, while engaged with a crew of men in dismantling a caterpillar, he was down on his knees moving a roller weighing approximately 200 pounds when he got a catch in his back and had to stay in that position until he could get his back in a normal position. He continued to work that day and at evening he told his foreman, whom he called Blackie, that he had a catch in his back. The foreman cautioned him to take it easy and inquired whether he would be able to work the following day. Claimant returned to work the following day, performing light duties assigned to him by Blackie. Claimant described the catch as being in the muscles of the back on both sides of his spine, but said there was no sensitivity in the area of the spine itself.

The morning of claimant's third day of work, November 20, 1951, he was sent down into the spillway of the dam project to determine the cause of non-operation of an arc welder set between some vertical steel rods. He stepped up approximately three and a half feet to view the welder, then started to fall. He fell backwards, landed on his feet, and then continued to fall back until he struck a steel rod "cut off like an inverted 'V'" and "hit it in the crotch in the coveralls." The small of his back was against the steel rod. He slid down the steel rod and finally sat flat on the spillway floor. He then arose, walked up the spillway bank (a distance of some 200 feet) and got in a pickup truck with his foreman. He testified he felt no pain until he went to sit down in the truck; then he felt pain in his back as if "something was split in there

and was grating on (him)"; that he felt pain in his spine; that the pain "shot down either leg at that time." He then told his foreman, "No kidding, I really hurt this time. I want authorization to go to a doctor."

That evening the claimant went to an osteopath in Bernalillo who gave him a manipulation. He returned to work the next day and worked at light duties. He had another osteopathic manipulation at the conclusion of work that day and did not return to work until November 26, 1951, a lapse of five days. He then worked until December 1, 1951, when he was laid off in a reduction of force. At the conclusion of his work each day he went to Bernalillo for osteopathic treatment.

After the termination of his employment, the claimant consulted with several doctors in Albuquerque, among them Dr. Simonds, orthopedic surgeon, who operated on him, performing spinal fusion on January 4, 1952. Following this operation and on April 21, 1952, the claimant was examined by Dr. Overton, orthopedic surgeon, who felt the fusion was unsuccessful and that claimant was totally disabled. A second fusion was performed on claimant's spine on September 3, 1953, by Dr. Simonds. At the time of the trial the claimant was still totally disabled and his future recovery was dependent upon the success of the second fusion operation.

The picture of the transactions between the claimant and the insurer during this period of time is as follows:

The first report of accident was dated November 21, 1951, and was signed by one Atkins, clerk or bookkeeper for the employer. The date of accident was given as "11–18–51 at 11 a.m.," and the report showed claimant incurred a "sprained back" while he was "lifting rollers out of a caterpillar frame."

The claimant was paid $25.74 workmen's compensation for the period from November 21, 1951, to November 26, 1951, for the days he was absent from work. This payment was made March 13, 1952. The next compensation payment was made December 14, 1951, in the amount of $30 and covered the period from December 4, 1951, to December 10, 1951. Thereafter compensation was paid claimant at the rate of $30 per week for about six months. A total of $1,126.31 was paid to claimant in this manner, of which $750 was paid in weekly installments for the six months' period. In addition, on April 18, 1952, he was given an advance of $120, which was followed by another advance of $300 made April 25, 1952. The insurer paid the doctor and hospital bills for the first spinal fusion operation.

On April 21, 1952, after a conversation between the claimant and a representative of the insurer, one Egan, the insurance

company at its expense had the claimant examined by Dr. Overton, who reported to the company as to such examination, the written report bearing date of May 12, 1952. Claimant talked with Dr. Overton on April 22, 1952, when he was shown x-rays and told he had a bad fusion and would probably need another operation.

A few days after the claimant had seen Dr. Overton, he again saw Egan and they talked about a settlement. The claimant testified his discussions with Egan only concerned a settlement for the injury of a wrenched back resulting from his first accident in moving the roller; that Egan had assured him the proposed settlement had nothing to do with claimant's second injury; that every injury was rated in the book—that he couldn't get "jipped"; that the advance on compensation paid claimant in April which carried compensation beyond date of settlement would be lapped over onto the second claim.

On May 5, 1952, the claimant went to Egan's office to arrange for the settlement. Upon arrival he was told to hurry over to the courthouse as the judge and others involved in the settlement were waiting for him. He then went to the courthouse; signed a claim in Civil Cause No. 50764, Bernalillo County, asserting an accident occurred on November 18, 1951, while claimant was lifting rollers out of a caterpillar frame, resulting in a wrenched back;

entered into a written stipulation of settlement; received $3,000 and executed a satisfaction and release of judgment.

About a month after these proceedings the claimant filed claim in Civil Cause No. 51022, Bernalillo County, the claim in question here, alleging injury arising out of and in the course of his employment while working for the defendant employer on the 20th day of November, 1951, as an operating engineer and mechanic in the following manner: "inspecting welding-machine in the spillway of the Dam Project, and lost balance while standing on machine, falling backwards onto spillway floor, landing on back between vertical reinforcing rods." The claim stated the injury had caused: "crushed vertebra and disc, requiring laminectomy to which claimant was required to submit, and resulting in shock and heart-damage; that claimant is informed and verily believes he will require further surgical, orthopedic, hospital, nursing and medical attention, at a fair and reasonable cost in excess of statutory limit, for which he now applies, in addition to attorney fees."

In answer to this claim the employer and insurer admitted the claimant had suffered a compensable injury in the course of his employment, but contended the claimant had received in addition to compensation benefits paid up to May 1, 1952, the sum of $3,000 as cash settlement for his dis-

ability; that the compromise settlement and award was approved by the court. A copy of the judgment in the earlier cause was attached to the answer which incorporated by reference the pleadings on file in such cause.

The various instruments in the prior cause will have to be examined with some particularity, but it will clarify the positions of the parties to state at this point that it is the general contention of the claimant that he suffered two injuries—one on the 18th of November, 1951, while lifting rollers from a caterpillar, producing a wrenched back, for which injury he accepted a lump sum settlement, and another injury on November 20, 1951, when, while inspecting a welder, he fell to the floor of the spillway of the dam, struck the steel reinforcing rods and sustained crushed vertebra and disc. It should also be noted the claimant has asserted his willingness to have the amount of the prior settlement and judgment deducted from whatever award he might receive upon his second claim.

It is the contention of the employer and insurer that the stipulation and settlement entered into by the parties was intended to and did cover the claimant's entire disability, as distinguished from the separate accidents he had suffered, and, moreover, that the medical testimony adduced at the trial established an injury and disability which could not be distinguished as having re-

sulted from one or the other of the accidents.

It is part of the argument of the employer and insurer that an accidental injury alone does not entitle an employee to workmen's compensation, but that the workman is entitled to compensation payments on the basis of *disability*.

In the view we take of this case the issues narrow to two, as set forth by claimant: (1) Did the evidence presented by the claimant raise a question of fact for the jury whether the settlement and judgment by consent in the former cause covered the disability complained of in the second claim? and (2) Was there sufficient evidence from which the jury could have found a distinction in result between the injury of November 18, 1951, and that of November 20, 1951?

The settlement and stipulation entered in Civil Cause No. 50764 provided, in material part, as follows:

"1. That the insurer has paid to the claimant as workmen's compensation as a result of the injury sustained by him the total sum of $1106.31 to and including May 1, 1952, and that in addition to said compensation, the insurer has paid the sum of $120.38 for medical and hospital expenses for and on behalf of said claimant and will pay additional medical expenses incurred in connection with treatment for and on

behalf of said claimant up to the date of this stipulation, it being understood that the claimant will pay any and all medical and hospital expenses of every kind and nature incurred by him from and after the date of this stipulation.

"2. That defendants agree to pay to the claimant, in addition to the sums already paid as set forth herein, the additional sum of $3,000 which said sum shall include all compensation to which the claimant might be entitled for any claim whatsoever which he might have or claim under the Workmen's Compensation Act of the State of New Mexico.

"3. That upon approval of this stipulation by the court and entry of judgment based hereon, and the payment of the sums set forth herein, such payment shall constitute full and complete satisfaction and payment for any and all claims arising out of or in connection with the injury referred to in said claim for compensation and that the payment of said sums shall include but shall not specifically be limited to all claims for disability, loss of time, attorneys fees, medical and hospital bills and all claims of any nature whatsoever by the claimant, arising out of or under the Workmen's Compensation Act of the State of New Mexico, or otherwise, and that such payment shall be a complete bar to any further claim

of any nature whatsoever by the claimant against the defendants or either of them in connection with the said injury."

The judgment entered reads as follows:

"The Court having heard and considered the stipulation for compromise settlement between the parties hereto and being fully advised in the premises finds that the compromise settlement is fair, just and equitable and is hereby approved.

"It Is Therefore Ordered, Adjudged and Decreed that the claimant have and recover judgment against the defendants for the total sum of $3,000.00 that said sum shall be in addition to the sum of $1106.31 heretofore paid to the claimant by the insurer as workmen's compensation benefits and shall be in addition to medical and hospital expenses heretofore paid by the insurer and shall be in addition to additional sums to be paid by the insurer for other medical and hospital expenses incurred for treatment of the injury of the claimant;

"It Is Further Ordered that upon the payment of the sums herein specified to the claimant, that such payment shall constitute full, complete and final satisfaction of all claims, past, present or future which the claimant may have or claim against the defendants or either of them on account of

the injury sustained by the claimant and it shall constitute full, complete, and final satisfaction and shall be a complete bar to any other, further or future, doctor, hospital or medical bills, attorneys fees or any other claims whatsoever by the claimant against these defendants."

■ The general rule in this matter is set forth in Black on Judgments, (2d Ed. 1902) Vol. 2, § 631:

"Upon a plea of former adjudication, the identity of the present with the former cause of action is a question of fact for the jury, to be determined by them upon the evidence adduced. If, however, the question is determinable by inspection of the record alone, without the aid of extrinsic evidence, it is then a matter of law and is for the court. 'What has been adjudicated in a prior suit is often a question of fact, which, on account of the looseness of our pleadings, has to be subjected to parol evidence and referred to a jury; but when it is determinable by the pleadings, it is always a question of law for the court.' * * *"

Aside from the differences set forth in the two claims filed as to the two accidents, their different dates of occurrence and the different injuries allegedly occasioned, the claimant relies upon the following evidence to establish that it was not his in-

tent to settle for the entire disability he was suffering from at the time the consent judgment was entered: He testified the representative of the insurer, Egan, told him he was only entering into a settlement for his injury of November 18, 1951; that the settlement had nothing to do with the injury of November 20, 1951; that an advance on compensation paid to him in April preceding the settlement in May of 1952 would be lapped over to the second claim; that every injury was rated in the book—that he couldn't get "jipped." It was established that the advance compensation payments carried the compensation the claimant received to July 25, 1952, or more than two months beyond the date of settlement and judgment. Egan was not in the employ of the insurer at the time of the trial of this case, and did not testify, but his successor testified the advance made in April of 1952 was out of the ordinary.

The defendants in support of the dismissal of the claim point to language in the stipulation and judgment which is susceptible of a very broad interpretation. In addition, they say they knew nothing about any accident on the 20th of November, 1951, until they received the written report of Dr. Overton dated April 12, 1952 (seven days after the date of settlement) which recited the two accidents; and that it was the intention of the parties to settle for the complete disability.

We believe the introduction of this extrinsic evidence was proper in explanation of the consent judgment according to the contentions of the parties and that a question of fact was raised as to the identity of the former with the present cause which should have been submitted to the jury.

We have been able to discover only one New Mexico decision in which a somewhat similar situation was presented to this court, In Re McMillan's Estate, 1934, 38 N.M. 347, 33 P.2d 369, 372. That case involved a dispute regarding the interest of the widow of a partner in a mining venture. The partners had each originally owned a one-third interest in the mine with the other one-third interest being in one George F. McMillan, who by will devised his interest in the mine in equal shares to the surviving partners. One of the partners, W. D. Murray, was administrator of the McMillan estate, and in his final accounting he set forth the interest of the wife of his partner, James T. Murray, who died following the death of McMillan and prior to the closing of that estate, as being an undivided one-half ownership in the mine. He later filed a supplemental report stating the ownership of the widow was really one-fourth instead of one-half. At suit of the widow, the hearing on the final account was postponed pending decision of a cause she had brought in district court to determine ownership of the mine.

In that action the court found the mine was an asset of the partnership and that it was operated by the partnership up to the date of the death of James T. Murray. Then, when the final account of the administrator in the McMillan Estate came on for approval in the probate proceedings, the widow objected to it and tendered in evidence the final decree and findings made by the district court in the action previously described. The judgment roll was not offered in evidence. The decree and findings were admitted over the objection of the surviving partner and administrator, but the court in probate refused to be bound by the district court's finding and decree as to the ownership of the property. The question was raised in this Court for the first time that in the absence of the judgment roll it could not be said that probate court erred in refusing to be bound by the facts found in that suit. In disposing of this contention it was held that as the findings and decree followed the general allegations of the complaint in the district court action, and as the question of ownership of the mine appeared on the face of the findings and decree to be properly in issue and essential to support the decree, the findings and decree were binding on the parties. It was said:

"The evidence as to the identity of the subject-matter in issue in the two cases was undisputed and the proof admits of only one conclusion. The

trial court only passed upon a question of law reviewable here. On the record before us the proof appears sufficient to invoke an estoppel by prior adjudication. * * *"

Although no question of fact was raised in the McMillan case, we believe the foregoing language from that decision recognizes the distinction generally made in such matters as to questions of law and of fact, and affords precedent for our present holding that issue of fact was raised and such issue should properly have been determined by the jury.

Cases from other jurisdictions illustrative of situations in which the question was properly submitted to the jury are: Missouri Pac. R. Co. v. Burks, 1938, 196 Ark. 1104, 121 S.W.2d 65; Dolby v. Whaley, 1938, 9 W.W.Harr., Del., 155, 197 A. 161; Calva v. J. Laskin & Sons Corp., 1952, 279 App.Div. 850, 110 N.Y.S.2d 153; Berkowitz v. Equitable Life Assur. Soc., Sup. 1940, 21 N.Y.S.2d 206; Boos v. Claude, 1943, 69 S.D. 254, 9 N.W.2d 262.

The appellees do not seem to dispute that such issue of fact should go to the jury; but defend against this claim of error by arguing there was nothing to establish any distinction in the disability caused by the two accidents. While this argument is persuasive, and while the testimony of the claimant and his witnesses striving to establish such a distinction is rather thin,

we are unable to say if a jury were to award him compensation there would not be substantial evidence to support the award.

Several doctors testified upon the trial, none of whom were willing to make an outright distinction in the results of the two accidents, or say which accident caused the severe back condition necessitating the operations claimant underwent, asserting either of the accidents could have caused the condition of disability. The claimant did not see a doctor or have any medical care after the first accident and all of the doctors who testified had examined or treated him on the basis of his over-all condition. While there was thus a lack of positive expert testimony that the second accident resulted in the disability complained of, one doctor did testify as follows:

"Q. Doctor, are you able to tell us which of the injuries he (claimant) related to you produced the intervertebral disc for which he was presumably fused? A. Well, I think that is almost impossible. I think one might have some ideas—the man was hurt and wasn't able to continue work, a severe injury followed by pain that went into both legs. If I had to make a choice I would probably say that the second injury was most likely the one that caused the disability. However,

I don't think anyone can be absolutely sure."

We believe this testimony, together with the testimony of the claimant regarding the nature of the accidents and the different type of pain he felt resulting from them presents sufficient basis on which a jury might determine a distinction existed between the effects of the two accidents, and such issue should have been submitted to it.

In so holding, we are aware of two prior declarations of this Court as to the character of proof which must be offered to establish that a condition of disability resulted from an alleged accident or injury. In Henderson v. Texas-New Mexico Pipe Line Co., 1942, 46 N.M. 458, 131 P.2d 269, 272, we said:

"We are committed to a liberal construction of our Workmen's Compensation Act in favor of the workman, and we have said that the injury need not result momentarily in order to be accidental; * * * Yet, as a basis for recovery some relationship between the accident relied upon and the injury suffered must be established. It cannot rest upon mere speculation. * * *"

This case was followed by Elsea v. Broome Furniture Co., 1943, 47 N.M. 356, 143 P.2d 572, 582, where we said:

"It would have exacted of the medical witness far too much to have required of him to state, as a matter of certainty, that the illness diagnosed was definitely caused by the alleged head injury of February 12. To say that it could have been, and probably was, so caused, with such conclusion based upon the patient's present state of health, his health history, the evidence of the head injury of February 12, and other pertinent factors, was sufficient in exactness to justify a submission of the issue to the jury. After all, medical testimony, as other expert evidence, is intended to aid, but not to conclude, a court or jury.

"The jury is entitled to rely upon rational inferences deductible from the evidence, whether arising from expert testimony or otherwise."

■■ These two declarations are not in conflict. The first announces there must be some causal relationship between the accident and the injury suffered—that the relationship cannot be established by "mere speculation." The second simply amplifies the first ruling by recognizing that while speculation alone is insufficient to establish such relation, it is not necessary that there be testimony of an expert witness establishing the relationship with absolute certainty. Furthermore, it is permissible for the jury to consider all other pertinent factors in addition to expert testimony. The result is that while the negative limit of claimant's proof is that

it cannot rest upon mere speculation, it does not follow that the affirmative limit is that of absolute certainty. Between these two poles the jury exercises its historic province.

The case is reversed and remanded with direction to the lower court to reinstate appellant's claim and proceed to trial thereon in accordance with this decision. It Is So Ordered.

SADLER, COMPTON and LUJAN, JJ., concur.

SEYMOUR, J., not participating.