292 P.2d 782
**R. T. WALLER, Plaintiff-Appellee,**

v.

**SHELL OIL COMPANY, A Corporation, Defendant-Appellant.**

No. 5982.

Supreme Court of New Mexico.

Jan. 17, 1956.

Neal & Girand, Hobbs, for appellant.

Easley & Quinn, Hobbs, for appellee.

SADLER, Justice.

The primary question for determination on this appeal is whether the evidence is sufficient to support the award made to plaintiff (appellee) as claimant in a workmen's compensation accident for partial permanent disability on account of an accidental injury to his back suffered in the course of his employment.

The plaintiff was an employee of Shell Oil Company, the defendant below and appellant here, working in the capacity of a roustabout in the oil fields in the vicinity of Hobbs, New Mexico. He had been working for the employer for approximately 19 months, initially in the warehouse department as a yardman for about 15 months, when he was transferred to the roustabout crew. While employed in the warehouse he had suffered a back injury, apparently of minor consequence since he lost no time and was paid no workmen's compensation.

On August 23, 1954, while working as a roustabout, he picked up a piece of two-inch pipe, some 14 feet long and weighing about 60 pounds. In attempting to change ends with the pipe, he suffered a back injury, the sensation from which was somewhat akin to an electrical shock, as he

described it. It was accompanied by considerable pain lasting about five minutes diminishing in severity over a period of fifteen minutes and finally settling into a dull ache. At the moment, the roustabout crew were engaged in "hooking up a Gasso Pump, getting ready to kill a well," as described by one of the workmen. The same witness also detailed some of the duties of a roustabout as being primarily maintenance work—painting, overhauling, keeping equipment in shape and installing new equipment. At times some heavy lifting is involved.

The fact that plaintiff had suffered an accidental injury to his back was unknown to other members of the crew at the time. Two of them were engaged in some other duty at the moment and not looking at, or toward, the plaintiff. Almost immediately, however, he mentioned the fact of his injury to one of them, some 30 feet distant from the plaintiff, the same being overheard by the other, as he stated: "I pulled my backbone." A first aid report was made of the injury and the following day he was sent to Dr. Holland, a company physician at Hobbs, New Mexico. Dr. Holland informed him, to use the words of the plaintiff:

"That I had pulled muscles loose from the bone in my back and the only treatment for that would be complete bed rest. He asked me if I could go home and stay flat on my back in bed for two weeks getting up only one time per day to go to the bathroom. He said if I couldn't do that at home, he'd put me in the hospital where I'd have to. That was the only way that my back, that the muscles would grow back and be of any service to me. Well, I told him that I could do that at home and went home and started carrying out his plans. Let's see, that was on Tuesday. On Wednesday, Mr. 'Red' Johnson and Mr. Goodpasture came out to my house, and they didn't like Dr. Holland's treatment. They didn't care much about it, but I reckon I shouldn't say this, it might interfere with Mr. Goodpasture's job. I wouldn't want to hurt him in his present job in any way—but he made the remark about Dr. Holland. He said he wasn't any good for anything other than pregnant women and * * *."

According to the plaintiff the defendant employer then sent him to see Dr. Edward T. Driscoll, an orthopedic surgeon at Midland, Texas, who examined and treated plaintiff. He returned to work on August 30, 1954, after being off the job for four days. Dr. Driscoll informed plaintiff that Dr. Holland was on the right treatment and suggested that plaintiff add a little infrared heat to his routine. The plaintiff explains his early return to work by stating he was induced to do so on August 30, 1954,

486

by his supervisors in order to make the safety records of the company look better. Dr. Holland released him for light duty work only, as the plaintiff testified. Upon his return to work, his coworkers assisted him in the performance of his duties, a common practice as explained by one of the workers when a man comes back on the job following an injury.

All the physicians and surgeons who examined the plaintiff diagnosed his injury as "lumbosacral strain," being a strain on the muscles of the back. Defined in the language of one of the physicians testifying: "A lumbosacral strain is undue stress to the ligaments that support the juncture of the fifth lumbar vertebra and the sacrum." Furthermore the X-rays taken by different physicians, and there were several sets of them, confirmed said diagnosis.

They also showed a slight hardening of the bone at the lumbosacral junction. This is described as sclerosis, a hardening of the bone at lumbosacral junction. Dr. McIntire said it may be caused by irritation of the joint, or just the wear and tear of age, since it appears in many of us with advancing age. All physicians or medical experts testifying were in agreement that there was no injury to the discs in plaintiff's back. All likewise agreed there was some disability partial in character.

The evidence discloses, both from the testimony of Dr. McIntire, a witness for plaintiff and from Drs. Holland and Driscoll, who testified for defendant, that their diagnosis of plaintiff's injury as to extent and character was based entirely on subjective symptoms. Dr. McIntire explained the difference between objective and subjective symptoms, as follows:

"Q. I wish you would explain to the jury the difference between the objective and subjective symptoms. A. Objective symptoms are things that are felt by the patient or are symptoms that he can tell you, the examining physician, but he has no way of determining himself that they are there. Objective symptoms are something that the examining physician can feel, see, hear. In other words, it is something that you can put your finger on and say there is something there. Subjective symptoms are something that the examining physician has no way of proving whether it is there or not there.

"Q. Now, Doctor, I'm not trying to hold back anything in this case or to mislead the jury in any way. Does Mr. Waller have any objective symptoms? A. No, sir.

"Q. Does he have any subjective symptoms? A. Yes, sir.

"Q. And it is on the basis of his subjective symptoms that you make your diagnosis, is that right? A. That's right.

"Q. Is that the case in the back injury cases many times, Doctor? A. Yes, sir.

\* \* \* \* \* \*

"Q. And a subjective symptom is you take the man's complaints and, from his complaints, say; well, if those complaints are true, well there is a possibility? A. That's right. It's something you take his word for.

"Q. It's a possibility and could be— as far as you as a doctor are concerned; you don't know whether it is or not? A. That's right, sir.

"Q. Well, that's exactly what 'subjective symptoms' means. All of these symptoms were subjective in this case, weren't they? A. Yes, sir.

"Q. Except this: The pin prick examination of his feet is objective, isn't it? A. No, sir. That's subjective."

Dr. McIntire's examination of the plaintiff on December 31, 1954, following the accident was described by him, as follows:

"In the first place, the history was taken from the patient as to how the accident happened, what treatment he had had, and what his complaints were at the present time. Then I had the patient get undressed, and examined his back and legs. The positive findings, that is, the things that we found was slight tenderness over to the right and left of the lumbosacral junction, and at the lumbosacral junction. Forward bending was slightly limited but not painful. Backward bending was not limited but was painful. Bending to the right was not limited or painful. Bending to the left was not limited and slightly painful. The tests were negative, that is, they were normal. He had normal sensation in the feet. The reflexes were normal."

The plaintiff also testified to a numbness in his heel but his own physician, Dr. McIntire, found no so called "dead spot" in his heel. He gave it as his opinion, also, that six to eight weeks treatment under a physical therapist would help plaintiff's disability. He went on to testify:

"Q. Do you think that this patient, in his present condition, can do heavy labor? A. Yes, sir.

"Q. What do you classify as heavy labor? A. Lifting, shoveling.

"Q. How much could he lift, do you know? A. I believe that he can lift about as much as anybody else can.

"Q. In other words, without going through any sort of treatment that you spoke of? A. Yes, sir.

"Q. He can do that? A. Yes, sir.

"Q. Today, do you think he could do heavy lifting just like any person, any other man, is that right, Doctor? A. I believe he'd have some discomfort in doing it, but he could do it. Physically, he is able to do it."

488

On cross-examination this same witness for plaintiff, Dr. McIntire, testified:

"Q. Doctor, in this case, did you make a written medical report to the attorneys of the plaintiff? A. Yes.

"Q. In that report, did you say: 'The patient now, without further treatment, I believe has a 10 percent partial disability'? A. Yes, sir.

"Q. That, with treatment, will be reduced to nothing, or, almost nothing? A. Yes, sir."

The testimony of Drs. Holland and Driscoll, witnesses for the defendant, who had examined the plaintiff, was along the same line.

We do not overlook that plaintiff testified he was unable to perform the duties of a job involving heavy lifting. After leaving the employ of defendant he was not working for about three weeks. He then got a job with the B J Service, truck driving, not supposed to do any lifting. On a trip to Sweetwater, Texas, however, "to pick up a van," supposedly empty, he found a little cement—94 pound sacks—in it, and "helped unload it a little," hurt himself, claimed he "couldn't hold up to that" and had to ask for a lighter job. Thereupon, he was transferred into the office—says he just stays there in the office and answers two telephones and a short wave radio.

On September 28, 1954, he was fired by his employer, the defendant, for whom he worked when injured. The official firing him, Mr. Goodpasture, as related by plaintiff, told him his "back wasn't any good and never would be any good and that I (he) ought to get a job peddling shoes."

We think it is a fair appraisal of the testimony as a whole to say it does not afford substantial evidence for an award of 20 per cent. partial permanent disability. The trial court declined to submit to the jury an issue of *total* permanent disability, as claimed by the plaintiff in the complaint filed. It also denied defendant's requested instruction for a directed verict in its favor interposed when the paintiff rested and another like motion presented at the end of the case, when both parties had rested. The denial of these motions is presented as claimed error under Points 1 and 2 in defendant's brief in chief.

▆ We think the trial court properly overruled each motion. There was ample evidence to support a finding by the jury that the plaintiff had some partial permanent disability but not to the extent found by the jury. The cause was submitted to the jury on special interrogatories, as follows:

"Verdict of the Jury

"1.

"Do you find from a preponderance of the evidence that the plaintiff suffered an injury while working for the defendant, Shell Oil Company, on August 23, 1954, and

that plaintiff is now partially disabled because of said injury?

"Answer Yes or No as you shall find. Yes

"If you answered the foregoing interrogatory in the negative, you need not answer the remaining interrogatory, but if your answer is in the affirmative, you will then answer the following interrogatory.

"2.

"What is the percentage of his present partial disability?

"Answer. 20 %
"/s/ L. C. Hibdon
Foreman"

Upon the answers to these special interrogatories the court entered judgment against the defendant for an award of compensation for $6 per week for the period of plaintiff's disability not exceeding 550 weeks, medical expenses of $125 and attorneys fees of $400. The defendant asked the trial court to instruct the jury that it could not return a verdict finding plaintiff's disability in excess of 10 per cent. The court declined to do so and in so ruling, we think, the court erred.

We are not unmindful of our earlier cases holding that medical testimony, as other expert testimony, is intended to aid, but not to conclude a court or jury. See Elsea v. Broome Furniture Co., 47 N.M. 356, 143 P.2d 572; Lemon v. Morrison-Knudsen Co., 58 N.M. 830, 277 P.2d 542; Gilbert v. E. B. Law & Son, Inc., 60 N.M.

101, 287 P.2d 992, and Seay v. Lea County Sand & Gravel Co., 60 N.M. 399, 292 P.2d 93, only recently decided. We have no intention of overruling these cases on this subject. Nor do we think our holding in this case in any way modifies or impairs the decisions mentioned.

What we here hold is that where a plaintiff's entire case rests upon proof of subjective symptoms and the testimony, not alone of medical experts produced by defendant, but of a physician presented and vouched for by the plaintiff, himself, flatly contradicts the finding of the jury as to the extent of disability, partial in character, it so weakens the testimony relied upon as to deny it substantial character. The persistent effort of plaintiff's counsel to draw from the experts, even his own, the slightest evidence of damage to a disc in the spine ended in complete failure. The same result followed the effort to have confirmation from plaintiff's expert, Dr. McIntire, of the presence of a "dead spot," or numbness, in plaintiff's heel.

█ Indeed, throughout the testimony failed to show anything beyond soreness from muscular strain, following an unwitnessed accidental injury. This is not to imply there is not substantial evidence to support the jury's finding there was such an accidental injury. The evidence is compelling, nevertheless, that a finding of 10 per cent. partial permanent disability is quite liberal, thus leaving anything above

that figure without substantial support in the evidence.

Accordingly, the judgment will be reversed and the cause remanded with a direction to the trial court to set aside its judgment and enter another in plaintiff's favor based upon a partial permanent disability of 10 per cent., the award for medical expenses and attorneys fees to stand.

It will be so ordered.

COMPTON, C. J., and LUJAN, McGHEE, and KIKER, JJ., concur.