## TEXAS EMPLOYERS INS. ASS'N v. YOUNG et al.

### No. 6508.

Court of Civil Appeals of Texas. Texarkana.

May 18, 1950.

Rehearing Denied June 8, 1950.
Further Rehearing Denied June 29, 1950.

Ramey, Calhoun, Marsh, Brelsford & Sheehy, Tyler, Norman, Stone, Rounsaville & Hassell, Jacksonville, for appellant.

Lewis & Chandler, Jacksonville, for appellees.

WILLIAMS, Justice.

Appellees, Mrs. Ora Young and children, claimants below, were awarded a lump sum judgment under the Workmen's Compensation Act, Vernon's Ann.Civ.St. art. 8306 et seq., against appellant, Texas Employers Insurance Association, growing out of the death of Frank Young, the husband and father. The jury found that on September 30, 1948, at or about 5 a. m., the deceased, while engaged "in firing a boiler and night-watching for and as an employee of Newton-Shank Manufacturing Company," overexerted himself; that this was a producing cause of the cerebral hemorrhage, which resulted in his death on October 9, 1948.

Appellant asserts that there is no evidence within the purview and meaning of the Texas Workmen's Compensation Act to support above jury findings or the judgment entered and that the evidence is insufficient to support such findings. Other than the death certificate, appellant offered no evidence. Claimants' case rests upon circumstantial evidence.

Deceased's employer who was engaged in the manufacture of fruit and vegetable crates maintained a boiler to produce steam which was fed into several vats on the premises. This steam used mostly at night conditioned the blocks of timber in the vats for the cutting or peeling operations by the day shift. The fuel used in firing the boiler consisted of the waste material from the cutting machine and various sizes of rejected timber, all of which were gathered into a pile near the boiler during the day to be used at night. It was necessary to fire the boiler or add fuel every ten or fifteen minutes to keep the steam up. The night watchman and fireman, the sole person on duty on the 5:30 p. m. to 5:30 a. m. shift, besides firing the boiler was required to punch every hour five time-clocks. Ten to twelve minutes were required to punch such clocks situated in the "big building," the office and the two floors of the warehouse.

At approximately 5:20 a. m., on September 30, the deceased so employed as the night watchman and fireman on this 5:30 p. m. to 5:30 a. m. shift was found in an unconscious condition, having suffered a cerebral hemorrhage or stroke of apoplexy. There was no visible sign of an external injury. He never regained his mental faculties sufficient to "carry on coherently." Some days later he was able to sit up in bed. He died October 9, from the effect of an internal bleeding or pressure on the brain caused either from the first stroke or possibly from a subsequent one.

Deceased had worked on this job at previous times, having served for a six-weeks period immediately prior to his death. He was 53 years of age, weighing 157 to 160 pounds and in appearance strong and robust. In an exchange of greetings when he reported for work on this 5:30 p. m. to

5:30 a. m. shift, he remarked, "Yes, I am all right." According to his son, deceased had visited a physician three or four weeks prior to his death for treatment of a cold. Other than what above details might reflect, the record is entirely silent as to the previous health record of deceased. Dr. Boyd, his attending physician, had never seen him until shortly after he suffered this stroke. Dr. Johnson who gave the other medical testimony had never seen him.

In support of their claim that over-exertion in the discharge of his duties was a producing cause of the hemorrhage claimants introduced evidence as to the character of work required to keep the steam up; namely, "It was a hard job"; "a lot of the rejected or defective blocks and remnants of blocks of timber would weigh 100 to 150 pounds, some in excess of 150 pounds"; "some would be so heavy that one man could not handle them"; "the waste or shavings from the machine could be handled with a fork"; "the shavings would burn like cardboard and called for more energetic work"; "the timber had to be lifted up into the furnace from a beaten depression at its mouth." It was the further testimony that from 12 to 5:30 a. m., the work grew more strenuous on account of the increase in distance necessary to carry the waste from the pile to the furnace, and further increased around 4:30 to 5:30 a. m., because more steam was then required for the vats.

In response to hypothetical questions propounded by claimants, the two physicians that testified are substantially in accord in their answers that over-exertion "could have precipitated and initiated the hemorrhage"; "may have produced it"; "may likely have been the cause"; "if he had some constitutional defect which made him liable, any type or strain could precipitate the hemorrhage"; "if I knew he had fired the boiler with heavy material shortly before, I would assume it likely caused it." In above hypothetical questions so propounded, it was assumed as true that deceased had been suffering from high blood pressure and during the previous night and shortly before the stroke had done strenuous work such as firing the boiler during the 5:30 p. m. to 5:30 a. m. shift by lifting and placing into the boiler heavy materials weighing 100 pounds or more.

This record does not disclose what the deceased was doing at the time of the stroke. No one was present at the time and no one had seen him within the previous twelve hours. He evidently had punched the time clocks around the 5 a. m. hour. At least 45 or 50 minutes had elapsed from the time the boiler had been fired and when he was found at 5:20 a. m. With this exception the record is silent as to what he had done during the preceding twelve hours. He was found outside of the "big building" which housed the boiler and machinery, in a path between the north door and a vat on the premises. The physicians' ability to diagnose the producing cause of the hemorrhage under all the facts and circumstances hereinbefore detailed may be summarized in the following question and answer.

"Q. Is there any way from those facts you can tell the jury the man's hemorrhage was precipitated by physical exertion? A. No, I can enlarge upon that; it is certainly common sense to assume. Nobody can say definitely about a situation like that unless previously somebody had seen him exert himself. If we had known he had very marked blood pressure, disease of the blood vessels and seen him exercise strongly, you could say it may have produced it and may likely have been the cause. I have no right to assume from my knowledge of the case that it caused it. Had he undergone this violent exercise and just stepped out into the cold air and nothing else had anything to do with it, it would be assumed this could be the most probable cause of the hemorrhage." It was further the testimony of the physicians that a person does not suffer a cerebral hemorrhage from an over-exertion unless there first exists an underlying disease of the heart or blood vessels spoken of as arterio-sclerosis. According to their testimony, a cough, a sneeze, straining at stool, physical exercise, over-exertion, or an emotional upset such as anger, fright or worry could or

might be a producing cause of a cerebral hemorrhage in a person then suffering with a diseased condition of the heart or blood vessels. Many suffer a stroke in their sleep.

■■■ The contention of appellant that the evidence is insufficient to sustain the findings of the jury is sustained. The burden of proof rested upon claimants to establish that deceased over-exerted himself, as alleged, and this was a producing cause of the hemorrhage and death. It is to be observed that under the assumed facts incorporated in the questions propounded to the physicians they could not or would not diagnose the producing cause of this hemorrhage other than to say it might have or could have resulted from over-exertion. They likewise enumerated various strains and stresses which might or could have produced such a hemorrhage. The finding that he did over-exert himself while engaged "in firing a boiler and night-watching" in the absence of testimony which would disclose what he was doing or had done shortly prior to the stroke must necessarily rest upon speculation and conjecture.

■ In Houston Fire & Casualty Ins. Co. v. Biber, Tex.Civ.App., 146 S.W.2d 442, 446, it is stated, applicable to the state of the record here, "Where the evidence shows that a particular result may possibly have occurred by reason of several different causes, and it is not more reasonably probable that one of the causes was operative rather than the others, a finding of causal relationship between the result and a particular cause cannot be sustained." See also Federal Underwriters Exchange v. Edwards, Tex.Civ.App., 146 S.W.2d 461; Southern Casualty Co. v. Flores, Tex.Com. App., 1 S.W.2d 260.

In view of above disposition, a discussion of other points presented will be pretermitted.

■ Since it does not conclusively appear that the case has been fully developed on the former trial, it is thought that justice may be better subserved by a remand of the case. Jackson v. Hall, C. J., Tex.

Sup., 214 S.W.2d 458. The judgment is therefore reversed and the cause is remanded.

Reversed and remanded.

On Motion for Rehearing

To meet the criticism made to the observations in the original opinion to the medical testimony, the testimony of Dr. Johnson, the more favorable to appellee's position, will be more fully detailed.

"A. With those facts the most logical explanation, he had a few hours before his death been engaged in some strenuous exercise of the type required to fire a boiler and if his diagnosis of a cerebral hemorrhage was made when he was taken to the hospital, it is my opinion the cerebral hemorrhage was precipitated by this physical labor involved in his duties."

"A. Yes, in my opinion, heavy work, any sudden physical exertion or emotional excitement, anything that causes the blood pressure to be brought up would precipitate a cerebral hemorrhage, considered a main cause; coming out of hot room into a cold place will have a reverse contraction of the blood vessels, and this might be a precipitating factor in producing a cerebral hemorrhage.

"Q. Do you agree with this statement being true medically:—The immediate rise in blood pressure which lead to the rupture of cerebral vessels may be due to many factors, as lifting, running, coughing, sneezing, straining at stool, coitus, parturition and all other efforts involving such strain; emotional excitement, as fear, worry and anger. A. I would qualify that as to the degree. A mild one won't cause it as much as a violent one. Yes, it is the degree of emotion and physical strain.

"Q. Isn't it a fact the effect of your testimony is that the physical exertion such as firing a boiler and the other stated in the hypothetical question might have been a precipitant cause of the cerebral hemorrhage? A. Correct. I was merely answering the hypothetical question; that it could be a cause; all I can do is give an opinion as a doctor that that was a precipi-

tant cause; and it is my opinion it could have been a precipitating cause."

The disposition of this cause for the reasons stated in the original opinion is adhered to, and appellees' motion for rehearing is respectfully overruled.