**292 P.2d 99**
**Ada Cass TEAL, Plaintiff-Appellee,**
**v.**
**POTASH COMPANY OF AMERICA, a**
**Corporation, Defendant-Appellant.**
**No. 5940.**

Supreme Court of New Mexico.
Jan. 5, 1956.
Rehearing Denied Feb. 17, 1956.

Neal, Neumann & Neal, Carlsbad, for appellant.

Leonard T. May, Carlsbad, for appellee.

SADLER, Justice.

The defendant below, as an appellant before this Court, complains of a judgment against it in favor of the plaintiff as the dependent widow of Jesse R. Teal in an action prosecuted under the provisions of New Mexico Workmen's Compensation Act, 1953 Comp. § 59–10–1 et seq., for the death of her husband from an injury found to have been suffered by him in the course of his employment by the defendant company. The case was tried before a jury in Chaves County, where the action was brought, though the decedent was employed and met his death in Eddy County, New Mexico.

The decedent was 66 years of age at time of his death, having continued in his work past retirement age, and was what is known as a ball mill operator in the potash ore refinery of defendant, located about 20 miles out of Carlsbad in Eddy County, New Mexico. He had been in defendant's employ for about 12 years. For some time preceding his death he had been in charge of the operation of four ball mills, Nos. 1 through 4, being thus in a position where he naturally was called upon to exercise some supervision over other employes engaged in ball mill work. He enjoyed the aid of a helper to assist in the ordinary labor of the operation.

At this point, it may be well to enter into some explanation of just what a ball mill is and the nature of its operation. The ball mills are large metal containers into which ore is fed by a belt conveyor from ore bins directly behind and slightly above the ball mills. Naturally, ore comes into the bins in varying conditions and at times when they are getting no ore from the mines the bins cake up on their insides and it is necessary to beat them on the outside to get the ore mesh loose and feed the ball mill. When the ore comes from the mine, it goes into the drying mill where it is ground into a quarter inch mesh, and from there it goes by conveyor belt to the storage bin directly behind the ball mills. David Goldsmith, Refinery Engineer for defendant, gave a somewhat lucid description of the operation under questioning by defendant's attorney, as follows:

"Q. I hand you Exhibit P–3 and will ask you to state what that is? A. These four bins here are the ore bins that hold the ore in back of the ball mill, and this conveyor comes up here over the top of the ore bins to deliver the ore.

"Q. This conveyor that brings the potash into the ore bins? A. Yes, sir.

"Q. And the potash will then drop down into the ball mill? A. It drops into the ore bin.

"Q. What happens when the ball mill operator is not receiving enough ore, what is the reason for that? A. There may be trouble in the mine that the ore is not coming into the shaft, or there might be a break down in the drying mill, and when that happens ore naturally feeds out of the center of the ore bin and leaves ore more or less caked up on the side of the bin.

"Q. What happens when they are not receiving ore and the ore has drained down through the center? A. They have to beat around the edges of the bin at the bottom to start the flow of ore."

The defendant worked three shifts and the decedent went to work with his shift at 3:00 p. m. on the day of his death, August 9, 1954. His helper had brought in a quantity of lead which was necessary in the operation of the ball mills. About 4:00 p. m. of this day ore from the large steel ore storage bins stopped feeding through to the ball mills, due to failure of production in the mines. This left a residue of ore now reduced to mesh caked to the interior sides of the storage bins. Accordingly, the decedent and his helper started beating the sides of the storage bines with heavy sledge hammers provided for that purpose in order to get the ore loose from the sides of the bins and start its flow anew into the ball mills. No other or different means of shaking loose caked ore from interior sides of the bins seems to have been improvised.

The day was hot. The work was heavy and hard and decedent and his helper were required to operate on a catwalk in a narrow space of two feet between the side walls of the building and the bins. The building was made of galvanized tin and the room of the same material. It had a tendency to receive and store heat, with very little circulation of air up near roof of the building where they were compelled to work, the bins being elevated some 25 feet above the ground.

Aside from the dust, heat, poor circulation and cramped quarters under which decedent and his helper labored, further discomfort arose this particular day from the fact that a new experimental process was being tested in ball mill unit No. 4. Its use caused certain fumes to spread throughout their working quarters to such an extent that they induced a stinging, or smarting, sensation in the nostrils of the workmen and as well a noticeable shortness of breath. While experimentation with this new process had been underway in mill No. 4 for some time prior to this day, for a seemingly unknown reason on this particular day the fumes from the operation were present in a more noticeable degree than on any previous day.

So it was and under such conditions that decedent and his helper worked at beating the bins from about 4:00 p. m. until 7:00 p. m., with a slight break for lunch around 5:00 p. m., after which they were aided by two additional workmen sent over by the shift boss to aid because of the stubbornness and tenacity with which the ore remained caked against the sides, in spite of all their pounding. It was during this slight pause for lunch that decedent confided to his helper that he "had got too hot up there," indicating the place where they had been beating the bins. The beating had continued uninterruptedly from 4:00 p. m. to 7:00 p. m. with the short break for lunch just mentioned.

There was no further record or testimony of labor by decedent from around 7:00 p. m. until somewhere around 8:00 or 9:00 o'clock p. m. when he was seen to pick up his sledge hammer and give one of the bins a few poundings with it. Shortly after this, he was last seen alive getting a drink of water from the refrigerated water fountain down on the main floor, near which and around 9:00 p. m., he was found in a state of collapse and unconscious at the water fountain with his head slightly under it. The shift foreman was promptly notified and artificial respiration was resorted to immediately. Since there was no doctor at the refinery, one was called from Carlsbad, some 20 miles away, but he had not arrived before death overtook decedent and they had begun the journey to Carlsbad with his body.

Since the chief claim of error arises on a challenge to sufficiency of the evidence to sustain the verdict returned, we have reviewed it with painstaking care and must give it as our considered judgment that it meets the requirement of substantiality. We are not unmindful that the exact and precise cause of death is not established with the degree of proof desirable. But death occurring with the nearness it did to the extreme strain and exhaustion decedent had just undergone, plus the conditions under which he labored, all contribute to make it a matter of permissible inference, in our opinion, whether the strain and exhaustion were not a proximately contributing cause of the workman's death and, hence, compensible under our Workmen's Compensation Act.

Of course, the Act does not make the employer an insurer of the employee against injury or death occurring during his hours of employment. Martin v. White Pine Lumber Co., 34 N.M. 483, 284 P. 115; Aranbula v. Banner Mining Co., 49 N.M. 253, 161 P.2d 867. And the burden is always on a plaintiff to establish that the employee sustained an accidental injury in the course of his employment and arising out of it. Clower v. Grossman, 55 N.M. 546, 237 P.2d 353; Campbell v. Schwers-Campbell, Inc., 59 N.M. 385, 285 P.2d 497. But where, as here, there is a sequence of

events in rapid order, such a brief hiatus of time between the exertion, followed by the quenching of thirst with refrigerated water and, then, sudden death, the natural experience of mankind suggests there likely is a causal connection between the strain and exhaustion, on the one hand, and the consequent death on the other. The latter, of course, may not rest on mere suspicion, surmise or guess. Campbell v. Schwers-Campbell, supra. But it may arise as a fair and legitimate inference from circumstances in evidence. Clower v. Grossman, supra.

If, as a matter of fact, the decedent's death arose from over-exertion, exhaustion and strain, working under the conditions shown one of which, to say the least, was fumes from the testing of a new process, inducing among other things, shortness of breath, we think a jury would have no difficulty in inferring it resulted from a cardiac injury arising out of and in the course of employment within definitions of an accidental injury approved by this Court. Christensen v. Dysart, 42 N.M. 107, 76 P.2d 1; Stevenson v. Lee Moor Contracting Co., 45 N.M. 354, 115 P.2d 342; Webb v. New Mexico Pub. Co., 47 N.M. 279, 141 P.2d 333, 148 A.L.R. 1002; Hathaway v. New Mexico State Police, 57 N.M. 747, 263 P.2d 690. In the case first cited, next above, Christensen v. Dysart, supra [42 N.M. 107, 76 P.2d 4], after citing many

cases, we quoted approvingly from one of them, as follows:

"In Hill v. Thomas S. Gassner Co., 124 Pa.Super. 217, 188 A. 382, 384, the court said:

" 'Death in the ordinary course of employment, resulting from strain upon the heart caused by unusual exertion, is an accident within the meaning of the workmen's compensation statutes. * * On the other hand, death occurring while in the discharge of usual duties, in a normal manner without exceptional effort, is insufficient to establish a "mishap" or "fortuitous happening." ' "

True enough, the expert testimony of the medical witnesses did not go so far as to affirm that a heart attack was the cause of death and, if so, that it likely or probably resulted from the strain and exhaustion which decedent had just experienced, as outlined in the testimony. The most such witnesses were willing to say was that the sudden collapse and death of a man under the conditions shown who, until that time had enjoyed good health and had never before experienced vascular coronary trouble, might very well be attributed to such an attack then. These witnesses were frank enough to agree, however, that death under such circumstances could be attributed to other causes, or might follow when one was engaged in no activity whatever.

So ran the testimony of the expert witnesses which the jury was privileged to

accept, reject, or give such weight only, as it deemed the same entitled to have. Jamison v. Shelton, 35 N.M. 34, 289 P. 593; Elsea v. Broome Furniture Co., 47 N.M. 356, 143 P.2d 572. But if the medical testimony were ignored altogether and the factual issue present determined by drawing upon the vast reservoir of human experience common to the jurors, as well as to all men, who can say they were indulging in mere conjecture and surmise in saying this decedent died of a heart attack due to strain and exhaustion? Indeed, would the jury not be resolving factual probabilities in inferring that the unusual strain on decedent's heart, helped along by difficulty in breathing caused by fumes from testing a new process, invoked a heart attack and death. We think the jury had substantial evidence to support a verdict so reached.

We think it is to lose sight of the realities to hold injury or death from strain upon the heart caused by unusual exertion in meeting an emergent situation, outside performance of the ordinary duties of one's employment, is accidental and compensable, and deny character as accidental to a like injury or death where the physical exertion producing it was a concomitant part of regular performance of the duties of another's employment. To elucidate, if a workman whose job is one involving minor physical exertion from day to day, while on the job is called upon by a sudden and emergent situation, to exert unusual physical labor the strain of which produces a heart attack, the injury or death is accidental. Hathaway v. New Mexico State Police, supra. But if it so happens that the ordinary day to day performance involves hard, heavy labor, constantly, and one pushes oneself to the point of exhaustion precipitating a heart attack, it is not accidental.

There would be neither consistency nor logic in such contrary views. After all, it is the physical effort employed, the straining of oneself to the point of exhaustion, in either case, which produces the "unintended," the "unexpected," and the "unlooked for" result enabling the courts to characterize the injury or death as accidental. The physical exertion producing the strain on the heart is the same in either case and, obviously, had the workman exerting known or expected the result which followed, he would never have so exerted himself. Hathaway v. New Mexico State Police, supra; Godsman v. Grumman Aircraft Engineering Corp., 268 App.Div. 945, 51 N.Y.S. 2d 368; Barker v. Narragansett Racing Ass'n, 65 R.I. 489, 16 A.2d 495, 17 A.2d 23; Toland v. Murphy Bros., 172 Pa.Super. 484, 94 A.2d 156. See, also, Erholtz v. Balkan Min. Co., Minn., 70 N.W.2d 863; Gatto v. Newark Plaster Contracting Co., 12 A.2d 867, 18 N.J.Misc. 307.

In order to make out a case calling for a directed verdict for the defendant employer here, one is compelled, contrary to the governing rule, to weigh the evi-

dence and draw inferences against the verdict, which under a wealth of authority, illustrated by numerous decided cases, should be resolved in favor of the verdict. Snodgrass v. Turner Tourist Hotels, 45 N.M. 50, 109 P.2d 775; Giles v. Herzstein, 49 N.M. 41, 156 P.2d 160; Madsen v. Read, 58 N.M. 567, 273 P.2d 845.

Other claims of error are presented and argued, one being error in the trial court's action in denying defendant's motion for a directed verdict, and two others in refusing certain specially requested instructions. We have duly considered the points argued and do not find merit in any of them. Indeed, as to the first one mentioned, the disposition made by us of the first claim of error discussed, namely, sufficiency of the evidence to sustain the verdict, resolves it against defendant. And, as to those relating to the instructions, when we view them as a whole no doubt remains but that the jury was adequately charged with reference to the issues submitted.

The plaintiff asks for an allowance to her of some reasonable amount as attorneys fees for services of her attorney on this appeal. She will be granted the sum of $750 on this account.

Finding no error, the judgment will be affirmed.

It is so ordered.

COMPTON, C. J., and LUJAN and KIKER, JJ., concur.

McGHEE, J., dissents.

McGHEE, Justice (dissenting).

I am convinced the majority opinion is erroneous and is based upon erroneous reasoning. I made a thorough examination of the transcript and attach hereto as an appendix an abstract wherein is set forth a digest of all of the testimony of claimant's witnesses and case. About the evidence in summation, it can only be said (1) the cause of death was never established by anybody; (2) except for the acid smell in the No. 4 ball mill, there was no condition or exertion unusual to the employment; and (3) the most Dr. Salmon would say was that the exertion by Teal and the conditions of his work *could* have resulted in a strain which *might* precipitate a bodily change and result in his death—this on the basis there was already some underlying bodily condition which had not come to light prior to that time. When the doctor was asked to exclude other possibilities just as likely to have caused death, he would not answer "Yes" or "No" that the exertion and circumstances precipitated the death, and was only willing to say it could happen.

The majority opinion pays lip service to former declarations of this court that an employer is not an insurer of the life and health of his employees under the workmen's compensation act; that the burden is on the plaintiff to establish an employee sustained an *accidental injury* in the course of

416

and arising out of the employment; that death from heart strain occurring while the employee is in the discharge of his usual duties, in a normal manner and without exceptional effort, is insufficient to establish a mishap or fortuitous happening; and, finally, that causal connection may not rest on suspicion, surmise or guess. The majority opinion then ignores all these principles and declares, in essence, first, that the jury may determine from its natural experience that there was a causal connection between the strain and exhaustion and the death. Having gone so far, the jury may then conclude that since the exertion and the death are connected the death was the result of a heart attack arising out of and in the course of employment within definitions of accidental injury.

The majority opinion does mention that the medical witness was unwilling to say more than that death *could* have resulted from exertion under such circumstances, but that it also could have resulted from many, many other causes. The fact that the experts, whom we can only conclude have vastly more common experience in these matters than the jurors, did not draw the inference upon inference which the majority desire does not deter them one whit. Their solution is to say that the jury may completely ignore the medical testimony!

It seems to me a mere analysis of the structure of the opinion is sufficient to show

its error, but a study of the testimony shows without question, I think, that the most the jury had to go on was an unwitnessed, unexplained death which occurred during working hours and on the premises of the employer; the circumstance that the employee complained of being overheated as a result of exertions normal to his employment and under conditions normal thereto, with the single exception of the presence of chemical fumes in one of the ball mills (the only testimony as to the chemical was it had a pine base and contained nothing that was medically injurious); the medical cause of death was not established; the expert testimony was that possibly the exertion under such circumstances produced the death.

The overwhelming weight of authority in very similar cases denies compensation on the basis there is no competent evidence to establish a causal connection between employment and death. Indeed, I can find no contradictory authority upon similar facts, even in states such as New York and Massachusetts where the claimant has in his favor a statutory presumption providing that where an employee has been killed or is physically or mentally unable to testify, in the absence of substantial evidence to the contrary, the claim comes within the provisions of the compensation law, that sufficient notice of the injury was given and that the injury or death was not occasioned

by the wilful intention of the employee to injure or kill himself.

A rather detailed examination of a few of the authorities is in order.

In City and County of San Francisco v. Industrial Accident Commission, 1953, 117 Cal.App.2d 455, 256 P.2d 81, an award of death benefits to the widow of a deceased employee was annulled. The deceased, Murdock, aged 64, was employed by the Park Commission. He was, prior to his fatal seizure, in good health. On January 14, 1952, he went to work with other members of his crew to clean up several trees and branches blown down in his section of the park by a heavy storm the preceding night. Just before his seizure, Murdock and another man had been sawing a log some ten inches in diameter with a two-man, cross-cut saw. The foreman testified the sawing of the logs was heavy work and that the particular log was green. The sawing was the heaviest work in which the crew engaged in their duties and called for straining, but there was no rush and there was plenty of help. One of the crew called to the foreman who turned and saw that Murdock had collapsed. He was unconscious, his ears were turning blue and he sighed and tried to get his breath. The crew covered him and he was taken to a hospital in an ambulance and was dead on arrival. This summation of testimony represented the widow's entire case.

The City offered a doctor's report showing enlargement of decedent's heart, a profound degree of arteriosclerosis and evidence of old fibrosis, all of which were disclosed by the autopsy. The doctor concluded the cause of death was acute occlusive thrombosis of the right coronary artery, which was the result of long-standing, calcific arteriosclerosis of the coronary vessels and that this type of complication would occur at any moment of the day, regardless of the extent of physical exercise. The report, based on copies of the coroner's autopsy report, verdict of the coroner's inquest, and on a written statement of the decedent's working partner, was excluded from evidence upon the widow's objection. None of the matters on which the report was based went into evidence.

Parenthetically, it should be noted that in California, where the subject matter is within the exclusive knowledge of experts trained in a scientific subject, expert evidence is essential. However, California recognizes that expert evidence of a medical possibility, taken with other evidence of a non-expert character may be sufficient to support an inference of medical probability. See Fireman's Fund Indemnity Co. v. Industrial Accident Commission, 1949, 93 Cal. App.2d 244, 208 P.2d 1033. Therefore, it may be reasoned that California's burden of proof is no higher than that of New Mexico as expressed in our opinions in Elsea v. Broome Furniture Co., 1943, 47

418

N.M. 356, 143 P.2d 572, and Lemon v. Morrison-Knudsen Co., 1954, 58 N.M. 830, 277 P.2d 542. It should also be noted that in California, as opposed to the rule in New Mexico, Hathaway v. New Mexico State Police, 1953, 57 N.M. 747, 263 P.2d 690, only *usual* strain or exertion is sufficient on which to base an award where causation is established. Liberty Mut. Ins. Co. v. Industrial Accident Commission, 1946, 73 Cal. App.2d 555, 166 P.2d 908.

In the California case under consideration the court said [117 Cal.App.2d 455, 256 P.2d 83]:

"* * * When Dr. Chamberlain's report was excluded there was no medical evidence of any kind before the Commission. It is well settled that 'there is no presumption * * * that because an injury occurs in the course of the employment it arises out of or because of that employment.' [Citing cases.] To make out a prima facie case it is necessary to prove more than the fact that decedent died while performing a task required by his employment which he had performed on various occasions throughout the years apparently without incident. The present record is wholly devoid of evidence of the cause of death. It is true that the employee died immediately after performing a task that was the most arduous of any required by his employment. *However, it is not a matter of common knowledge, that operating a cross-cut saw with a partner on the other end is labor of such a strenuous type as to bring on a fatal heart attack.* [Emphasis supplied.]

"Since the autopsy report was not introduced, there was no evidence that the employee already had a heart ailment, from which the Commission might have inferred that such condition was aggravated by the strenuous task assigned to him. In fact there was no evidence that he died of a heart attack. As petitioner argues, from all that appears the cause of death may have been some form of poisoning or an attack of acute indigestion.

* * * * * *

"In Travelers Ins. Co. v. Industrial Accident Commission, 33 Cal.2d 685, 687, 203 P.2d 747, 748, it was said that *'An award based solely upon evidence tending to prove only a possibility of industrial causation is conjectural and cannot be sustained.'* In Fireman's Fund Indemnity Co. v. Industrial Accident Commission, 93 Cal.App.2d 244, 246, 208 P.2d 1033, 1034, this court held that 'expert evidence of a medical possibility taken with other evidence of a non-expert character may be sufficient to support an inference of medical probability.' But the evidence offered

by the widow herein does not meet that test. An award cannot be based on mere speculation that the injury was industrially caused. [Citing cases.]" (Emphasis supplied.)

Next, notice the case of Ingalls Shipbuilding Corp. v. Howell, 1954, 221 Miss. 824, 74 So.2d 863, 864. There Howell suffered a heart attack and became disabled. An attorney-referee heard the compensation claim and the commission denied an award. The circuit court reversed the commission and granted an award, then the supreme court reversed the circuit court and denied the award. The claimant was an experienced heater and shrinker of bulkheads. He was performing such work when he had a heart attack. He was using an oxyacetylene torch to apply heat to the bulkhead. He was working on a scaffold with his feet hanging between the scaffold and the bulkhead, stooping forward, bending down and holding the torch between his knees. While so engaged he had a sharp pain in his chest and a smothering sensation. Prior to this time claimant had had no heart trouble to his knowledge. He described the position he was in at the time of the heart attack as unusual or strained. It was attempted to be shown that there was insufficient oxygen in the air at the time and that noxious fumes were present, but the court said from the medical proof Howell did not experience symptoms indicating either of these conditions. Nor was any proof made that such heat as the torch generated had causal connection with the heart attack. The court said further:

"Three physicians testified, one the Ingalls' physician who first treated Howell, and who was Howell's witness, and two medical experts offered by the appellants. The Ingalls' physician, not a heart specialist, did not know what brought on the heart attack. The two heart specialists were of the opinion the work Howell was doing had nothing to do with the heart attack; that the attack was the result of a disease and was not precipitated by the work Howell was performing. The most favorable statement to Howell that could be elicited from one of the doctors was that it was possible for strain to cause such heart attack. Howell's family physician was not a witness.

"This case hinges on the question of causal connection; if Howell's work caused the heart attack or in any manner aggravated, accelerated or contributed to the attack, then Howell's heart attack is compensable. [Citing case.] But claimant must prove facts prerequisite to recovery; and causal connection is one of such facts. In this case there is no proof that Howell's duties caused, aggravated, accelerated, or contributed to the heart attack un-

less it can be said that the commission could find from common, or judicial, knowledge that such duties as a reasonable probability, caused, aggravated, accelerated or contributed to the attack.

\* \* \* \* \* \*

"Numerous cases have been cited by appellee, but we know of no case where this Court has held that a heart attack is compensable in the absence of proof of causal connection between the heart attack and the employee's work.

"In 1 Larson's Workmen's Compensation Law, Section 38.83, the rule as to causal connection is, in part, as follows: 'There must still be an unexpected result, and there must still be an exertion—some exertion—capable medically of causing collapse. This can by no means be taken for granted. If heart failure overtakes the employee while he is merely waiting for a bus or an elevator, you simply have no strain at all to provide an accidental result of employment activity. The natural progress of the disease may bring it to its fatal climax during working hours, but if the employee's activity at the time involves no effort, or effort which cannot support medically a causal connection, it can be rightly said that the outcome was neither accidental nor causally related to the employment. It was not accidental simply because it did not happen by chance; it happened by the inexorable march of the disease. It would have been accidental if the employee, by a miscalculation of his own strength, inadvertently hastened his own death by exertion that caused the final breakdown.

"'As the unusual-exertion requirement becomes more and more weakened by exceptions and interpretations, the burden of keeping this class of cases within proper bounds falls squarely on the shoulders of the expert medical witness and the expert trier of fact. Plainly, the heart cases will continue to be troublesome as long as some reach the appellate courts on a record in which the medical testimony is emphatically certain that effort and exertion have nothing whatever to do with coronary thrombosis, while most such cases are based on the opposite theory.'

"We hold that there was no proof before the commission that Howell's heart attack was probably caused by his work, or that his work probably aggravated, accelerated or contributed thereto. The finding of the commission was not based on substantial evidence. The claimant failed to meet the burden of proof as to causal connection."

In Houston Fire & Casualty Ins. Co. v. Biber, Tex.Civ.App.1940, 146 S.W.2d 442, 446, there was a similar failure of proof of

causal connection. Biber, who died as a result of a cerebral hemorrhage, was employed as a foreman by a cotton oil company in charge of a cotton seed house, an oblong building with walls ten feet high. The highest point of the roof was 51 feet above a concrete floor. The building was of frame construction with corrugated iron roof and walls and was used for storage of reserve cotton seed. On the date of the injury alleged the seed house was about nine-tenth's full, the seed coming up against the wall, except for two cleared spaces. There was a tunnel through the center of the building and there was a catwalk in the middle of the building about eleven feet below the peak of the roof. From the catwalk one could step off onto the stored cotton seed. There was a shed at the west end of the seed house, under which scales were located and there was a desk and counter there. The company office was located about 75 feet from the west end of the seed house.

Biber was supposed to supervise the unloading of trucks filled with cotton seed and look after the distribution of the seed within the building, checking its condition from time to time for excess temperature. He had several men under his supervision.

The temperature of the seed was taken with a special thermometer at the end of jointed metal pipes or rods. The thermometers were pushed into the cotton seed to a depth of 20 feet, either from holes in the walls of the building or by walking out over the seed from the catwalk and inserting the thermometers in the pile of cotton seed. Fifteen to thirty temperature checks were made a day.

On the day in question the temperature ranged between 88 and 89 degrees in the shade in the early afternoon; the sun was shining brightly. The temperature in the seed house was undoubtedly much higher because of the corrugated iron construction. The cotton seed tests showed temperatures ranging from 95 to 106 degrees. The humidity was high.

A witness testified he saw Biber come from the direction of the seed house, stumble and fall at the corner of the office building. Biber was gasping for breath, wet with perspiration and unable to talk. He passed out at the corner of the office building. Another witness saw Biber the same afternoon for ten or fifteen minutes; Biber was not doing any strenuous work of any kind at the time. While he and Biber were talking Biber put his hand to his head and said, "Oh, my head!" Biber died a day or so later.

The claimant put forth certain circumstances to indicate Biber had exerted himself prior to his fall in an unusual manner: Biber was even-tempered, a good workman and an active energetic man. He had been seen on the catwalk several times. He was perspiring profusely when he was picked up and his clothes were wet with perspiration when he was brought home. There

was an unusual amount of cotton seed in the clothing.

In this case there was, therefore, no *direct* evidence of physical exertion, but the medical witnesses all testified that death could have and probably did result from a cerebral hemorrhage brought on by physical exertion under hypothetical questions assuming that Biber would go up and down steps 40 feet in height and test cotton seed; that 23 tests were made of the cotton seed in the building that day, which tests called for Biber to go out over the cotton seed to insert the thermometer.

The court said:

"The medical testimony makes it clear that there are several possible fact situations which may have caused the cerebral hemorrhage suffered by Biber. Among others, there is the possibility that the hemorrhage may have been solely the result of disease. It may have been the result of an emotional disturbance. It may have been the result of muscular exertion. *It is necessary that some evidence of probative force beyond the raising of a mere surmise be introduced to exclude all other possibilities, before the remaining one can be raised to the dignity of a probability.* [Emphasis supplied.]

\*   \*   \*   \*   \*   \*

"Under the evidence of this case we do not believe it can be said without resort to conjecture or surmise that Biber had undergone muscular exertion shortly prior to the occurrence of the hemorrhage. \* \* \* The fact that Biber was about the premises of the employer, in itself is not sufficient to establish the necessary causal relationship. \* \* \* "

Also instructive in this opinion is the statement:

" 'A presumption of fact can not rest upon a fact presumed, or in other words, one presumption can not be based upon another presumption, nor an inference of fact upon other inferences.' 17 Tex.Jur. 247, Sec. 57. \* \* \* "

The detailing of more of the pertinent cases from other jurisdictions could be of only cumulative effect, and I am content merely to cite remaining ones. Finch v. Evins Amusement Co., 1949, 80 Ga.App. 457, 56 S.E.2d 489; Stepner's Case, 1952, 328 Mass. 230, 103 N.E.2d 227; Sandlie v. North Dakota Workmen's Compensation Bureau, 1940, 70 N.D. 449, 295 N.W. 497; Ackerman v. H. B. Wiggins Sons Co., 1941, 21 A.2d 628, 19 N.J.Misc. 519; Ezyske v. Waverly Fur Dressing Co., 1936, 183 A. 902, 14 N.J.Misc. 218; McCormack v. National City Bank of New York, 1951, 303 N.Y. 5, 99 N.E.2d 887; Hyshiver v. Hotel Laurelton, 1935, 246 App.Div. 660, 283 N.Y.S. 285; Texas Employers Ins. Ass'n v. Young, Tex.Civ.App.;

1950, 231 S.W.2d 483; Petersen v. Department of Labor and Industries, 1952, 40 Wash.2d 635, 245 P.2d 1161.

Some of the above cited cases are examples where there was very little or no exertion by the employee, but many of them are as much like the present case as those detailed above, and they all recognize causation must be proved by the claimant. The death alone, even following an amount of exertion which could be said to be the most strenuous exertion demanded of the employee, is not enough, and that where death is established to have been caused by heart attack or cerebral hemorrhage.

The majority opinion cites the following cases for the holding decedent suffered an accident arising out of and in the course of his employment: Hathaway v. New Mexico State Police, supra; Erholtz v. Balkan Min. Co., Minn.1955, 70 N.W.2d 863; Gatto v. Newark Plaster Contracting Co., 1940, 12 A.2d 867, 18 N.J.Misc. 307; Godsman v. Grumman Aircraft Engineering Corp., 1944, 268 App.Div. 945, 51 N.Y.S.2d 368; Toland v. Murphy Bros., 1953, 172 Pa. Super. 484, 94 A.2d 156; Barker v. Narragansett Racing Ass'n, 1940, 65 R.I. 489, 16 A.2d 495, 17 A.2d 23.

The holding in the Hathaway case was based on unusual exertion in the pursuit of a fugitive in rough terrain, followed by claimant digging his automobile out of the sand. As the opinion at page 756 of the New Mexico report (263 P.2d 696) states,

there seemed an agreed view among the medical experts who testified that the unusual strain or excitement, both physical and mental which claimant had experienced, either precipitated or was the predisposing or immediate cause of the acute attack which produced the disability.

The essence of the holding in that case is succinctly stated in syllabus 1:

"Disability in ordinary course of employment as result of strain on the heart because of unusual exertion, is an 'accident' within meaning of the Workmen's Compensation Act. 1941 Comp. § 57–902."

The material part of opinion in Godsman v. Grumman Aircraft Engineering Corp., supra, on appeal from an award by the State Industrial Board, reads [268 App. Div. 945, 51 N.Y.S.2d 369]:

"Decedent was employed as a fire guard. He died as the result of a cardiac attack after responding to a fire call. There is credible and strong proof that decedent underwent unusual exertion and excitement, sufficient to bring on the fatal attack. Under all the circumstances disclosed the Board could draw the inference that decedent died as the result of an accidental injury."

Gatto v. Newark Plaster Contracting Co., supra, is an opinion by a deputy commissioner of the workmen's compensation bureau. There a plasterer collapsed as the

result of a cardiac condition while he was plastering a closet on a warm day. There was ample medical testimony that a permanent, aggravated heart condition from which claimant was suffering was caused by doing the work in the closet on a hot day.

In Barker v. Narragansett Racing Ass'n, supra, the death of the employee was caused by an attack of acute myocarditis, induced by excessive heat and over-exertion as a contributing factor. Such fact was established by competent medical evidence as well as other evidence showing the conditions of heat and the overexertion of decedent.

Toland v. Murphy Bros., supra, is a heat stroke case. The temperature was ten degrees above normal and the claimant suffered the stroke after painting the inside of a very small, unventilated room. The point in the case is stated in syllabus 6, as follows:

"Right of claimant to recover compensation for heat stroke rested on theory that heat stroke is not the natural, probable and predictable result of an exposure to prevailing conditions, but constitutes an extraordinary and unlooked-for mishap visited suddenly upon claimant while at work."

Two medical experts testified the cause of the heat stroke was working in the small unventilated room in the unusual temperature and that claimant was working under more severe conditions than his co-workers.

Erholtz v. Balkan Min. Co., supra, is another heart case where the attack was caused by unusual exertion and the cause of disability was established by medical testimony. I quote from the opinion beginning at page 865 of 70 N.W.2d:

"A finding that the death of employee was caused by his work is amply sustained by the evidence. Whether the evidence sustains a finding that the exertion was something out of the ordinary or unusual when compared with his ordinary work so as to constitute an 'accident,' as we have defined that term in similar cases, is more questionable. However, if we accept the testimony of witnesses who said that the work was conducted under conditions of extremely muddy terrain and that the crew was shorthanded, which resulted in a much greater exertion than would be required ordinarily, the case comes within the rule which we have followed in many past cases. The employee had been checked semiannually by his family physician, Dr. H. A. Lamb, the last time about a year before his death. Aside from temporary high blood pressure, from which he recovered, Dr. Lamb never suspected that there was anything wrong with employee's heart. None of the men with whom he had

worked ever noticed anything wrong nor did his wife know that he had any heart trouble.

"From the autopsy it is difficult to escape the conclusion that employee's days were numbered because of the occlusion of his coronary artery, but that is not the test to be applied. The test, as we have said frequently in the past, is whether the unusual exertion to which he was subjected prior to his collapse precipitated his death so as to bring it about at a time when it would not have occurred normally. We believe that the evidence sufficiently sustains the commission's conclusion that the exertion here shown did so precipitate employee's death. As such, the findings of the commission must be sustained."

Until today we had the same rule as that stated by the Minnesota court in the Erholtz case.

I agree the facts in the cases just discussed support an award, and, had such evidence been present in this case, I doubt there would have been an appeal. But these cases are not authority for what is held by the majority.

It may be said in summary that the majority opinion has taken a hypothetical *possibility,* that death resulted from exertion, based upon another hypothetical *possibility,* that the accurate cause of death was a heart attack, multiplied them, added

the ingredient of the jury's "vast reservoir of human experience" and come up with a conclusion that there is substantial evidence of industrial causation.

The reason that probability is required in cases of this sort, rather than possibility, can perhaps be no better stated than in the case of Spolter v. Four-Wheel Brake Service Co., 1950, 99 Cal.App.2d 690, 222 P.2d 307, 310, where it is said:

"It must not be forgotten that in civil cases the law does not require absolute demonstration but only reasonable probability to support the finding of the jury. Juries in civil cases are so instructed every day. * * * This court recently had occasion to point out that 'moral certainty is not required in civil cases; there "reasonable probability" * * * is normally sufficient and is used as a counterpart to "preponderance of the evidence." ' "

Just as our substantial evidence rule is geared to "a preponderance of the evidence," so "preponderance of the evidence" is geared to "reasonable probability" in law, this "reasonable probability" cannot be established by a combination of mere "possibilities."

If the majority opinion stands as the law of this state, then a workmen's compensation policy is in fact a policy of life and health insurance if a workman dies or has an attack of illness on the job.

Being of the opinion the judgment rendered and affirmed is against both the evidence and the law, I dissent.

## Appendix

Digest and Summary of Evidence of Plaintiff's Witnesses and Case

J. L. Boatright

"Was working with Teal on the 3:00 o'clock shift. About 4:00 p.m. ore stopped going through, and "we were up there beating the bins so we could get the ore in the bins out." It was hot that day, hotter where they were working than on the outside; acid in No. 4 ball mill would burn your nose; did not pay any attention to whether it affected his eyes; no artificial circulation of air or fans.

Ate lunch about 7:00 o'clock; Teal appeared to be in good physical health prior to that time. When they sat down to eat Teal came back to where Boatright was and sat down; "I do not remember whether he (Teal) ate or not but he said he got too hot up there."

Sometime between eight and nine o'clock Teal came back up to the bins. He hit four or five licks and then left and witness did not know where he went. Was part of their regular job to keep the ore going through the ball mills—no way to get the ore going through the mill again when it stopped except by beating the bins."

(On cross-examination)

"Q. You say on this particular day it was very hot in there? A. Yes, sir.

"Q. Any hotter than usual? A. No, sir, it is always about the same up there in the summer time.

"Q. Did you look at the temperature that day inside the building or out? A. No, sir.

"Q. What you experienced there that day while working was the same condition you had experienced on the job for sometime? A. Yes, sir.

"Q. * * * you beat some bins nearly every shift, do you not? A. That is according to whether we got ore or not; if we get ore for eight hours we do not have to beat them.

"Q. Are there many times you get ore coming out of the bins for eight hours? A. A few times.

"Q. The usual thing is to run out of ore sometime during a shift in some bins? A. Yes, sir.

"Q. You say both you and the helper to Mr. Teal when you worked with him, and Mr. Teal as ball mill operator, did quite a bit of bin beating? A. Yes, sir.

"Q. On this particular day after you had your lunch up there with Mr. Teal, or he was up with you while you had yours, he did make the remark, did he not, he had gotten too hot? A. Yes, sir.

"Q. And he did not go back to beating bins after that time, did he? A. He went back between eight and nine o'clock.

"Q. But he did not go back with you at seven o'clock? A. No, sir.

"Q. When did he go back? A. Sometime between eight and nine o'clock; I did not have a watch and I do not know what time it was.

"Q. At that particular time exactly what did he do? A. He came up there and hit the bin about four or five times and then he left?

" * * * * * *

"Q. The building itself is a large building? A. Yes, sir.

"Q. Is it open on many sides? A. No, sir, it is not open on many sides; it is not open hardly at all on the side.

"Q. Where is it open? A. The doors, and between No. 3 and No. 4 there is quite a big place you can go through.

"Q. There is quite a bit of air coming in below there? (Mills sit on concrete platform about 6 feet above ground.) A. It might come in below but it does not come in up above.

"Q. But there is quite a bit of circulation? A. Yes, sir.

"Q. The conditions there were about the same as they had been? A. Yes, sir.

" * * * * * *

"Q. You said there were some fumes out there from No. 4; what was the nature of it? A. A kind of acid used on that supplemental unit.

"Q. Were they thick and heavy? A. No, sir, just something you could notice in the air.

"Q. Did it bother you any? A. It burned my nose.

"Q. Severely or just sting? A. Just sting.

"Q. There is always dust and fumes out there and you feel it on your lips and so forth? A. Yes, sir.

"Q. Other than that little stinging sensation from the exhaust fumes there was nothing unusual out there that afternoon? A. Nothing except that acid smell.

"Q. But other than that? A. No, sir. (Teal had other duties than beating the bins.)

" * * * * * *

"Q. Actually he (Teal) sought for helpers so far as beating the bins is concerned when there was too much beating plus his other duties for one man to do? A. Yes, sir.

"Q. Services of helpers to beat the bins is the usual practice out there, is it not? A. Yes, sir.

"Q. And it was usual on this day; it was done on this day the same as any other day when the bins were not full? A. That is right.

428

"Q. Actually then as far as further beating was concerned, Mr. Teal did after seven o'clock come up and hit it two or three times but he did not engage in further beating that evening after seven o'clock? A. Not that I remember of.

"Q. About beating, I believe I asked you this, is it necessary to beat bins nearly every shift? A. It is according to whether we get the ore or not; if we get the ore we do not have to beat them.

"Q. You do not have to beat bins unless you fail to get ore? A. No, sir.

"Q. And practically on every shift you do not get ore and you have to beat the bins? A. Yes, sir.

"Q. And that is what occurred on this date? A. Yes, sir."

(Redirect Examination)

"Q. You have been questioned about the heat or the temperature out there where you were pounding on these bins; was that temperature sufficient to make you perspire? A. Yes, sir. * * * You can wring the sweat out of your shirt.

"Q. Was Mr. Teal's shirt the same way? A. Yes, sir.

"Q. * * * does that circulation of air reach you where you were pounding on the bins on the cat walk? A. No, sir.

"Q. Had you noticed these acid fumes any other time prior to this day? A. No, sir.

"Q. But they were very noticeable on this day? A. Yes, sir.

"Q. Enough that they burned your nose? A. Yes, sir.

" * * * * * *

"Q. On this particular day you had two helpers come to help you beat on the bins? A. Yes, sir.

"Q. Was that a regular occurrence when you beat the bins to have helpers come to beat the bins? A. Yes, sir, if we could not handle it by ourselves."

Calvin Crowe

Was clean-up man at refinery the night Teal died. Little past seven o'clock got a call to go up and help beat the bins in the ball mill, and did so with a sledge hammer; Teal and Boatright were working there when he arrived; Teal beat the bins same as he (Crowe) did; Teal was pretty wet with perspiration; it was warm where they were working (about 25 feet up from the ground).

"Q. Was the air circulating up there? A. Well, it was quite dusty, and I only know of two openings there right close and the air was pretty hot up there.

"Q. Were you getting fresh air in that vicinity from anywhere else? A. There are some openings in the building, yes, sir.

"Q. Was fresh air coming to you where you were working? A. Yes, sir, fresh air would circulate through there.

"Q. Did you notice any other odors or smells other than the dust that day? A. Yes, sir, I did.

"Q. What did it smell like? A. Well, I am not very familiar with chemicals, what they use in processing this potash, there is a continuous smell in there to me all the time.

"Q. Did it affect you in your breathing? A. It made me short winded.

"Q. Was it a burning smell; have you ever smelled acid? A. Yes, sir.

"Q. Did it smell anything like acid? A. Yes, sir, it smelled something like acid."

(Cross Examination)

"Q. Did you get sweaty up there that day? A. Yes, sir.

"Q. Anybody who works up there gets a little sweaty? A. If they work, yes, sir.

" *      *      *      *      *      *

"Q. Had you ever beaten bins before this particular day or night in August? A. Yes, sir.

"Q. That is pretty regular work when you are working around the refinery? A. When they run out of ore it was pretty regular if you had some-

thing happen and you wanted to get the potash down you had to beat it down.

"Q. The beating of the bin was getting more of a regular chore on pretty much every shift; one bin or another had ore beaten out of it at times? A. Well, I spent quite a few shifts where I never beat the bin.

"Q. And you spent quite a few where you did? A. Yes, sir.

"Q. As a matter of fact you spent more shifts when you did than when you did not? A. I would not say for sure; I would not want to say whether I beat them more or beat them less.

" *      *      *      *      *      *

"Q. Did you notice some odor there in the refinery that you had not noticed before, some acid smell? A. I would not say it was acid but there was something that smelled up there to me.

"Q. But it was the same smell that you had smelled before; there was nothing peculiar in the air that day, was there? A. I do not know if it was anything peculiar or whether I worked harder but I know I got short winded that day.

"Q. Do you know what the temperature was that day? A. No, sir.

"Q. They are all pretty hot in the refinery? A. Yes, sir.

"Q. But you noticed nothing strange in the smell that day except you said

you got short winded? A. Well, it smells.

"Q. It smells all the time does it not? A. Well, it smells worse some days than others; I know they use a chemical but I do not know what it is.

"Q. And you do not know how regular or how infrequently? A. No, sir."

Dr. Salmon (Medical Expert)

(Dr. Salmon was the only witness questioned as to the cause of death. There apparently was no autopsy.)

"Q. Will you assume these facts to be true; that Jesse R. Teal died on August 9, 1954, at his place of employment in a potash refinery twenty-two miles East of Carlsbad, New Mexico, following employment and work at regular hours, going to work at three o'clock in the afternoon and working following that a heavy work of pounding on the metal sides of four bins with a sledge hammer near the roof and side walls of a metal building under conditions of heat and poor air, perhaps dust and other things in the air including acid fumes; following this exertion he became what he terms as overheated and later after a short period of additional exertion went to the refrigerated water fountain in the building and was found there shortly thereafter unconscious, and that he later died within a short while before medical attention

could be procured for him; assuming those facts to be true and assuming there was no history of pre-existing heart trouble or heart ailment, would you place a causal connection with the exertion of pounding the walls of this steel bin, the type of work he was doing, with his collapse and death? A. A possible causal relationship might exist there.

"Q. What would that be? A. Well, the series of circumstances you have related might be considered to be an extraordinary effort in the course of this man's occupation at that particular time, and the combination of conditions might have had an effect upon some underlying condition which had not come to light prior to that time. In other words, that type of exertion, that situation in which he found himself, could have resulted in a strain which might precipitate an acute or a sudden change within his body resulting in death at that particular time.

"Q. In the absence of any precipitating causes, would you be of the opinion that this exertion and the conditions could have precipitated this collapse and death. A. It is possible these conditions might have precipitated the collapse and death.

"Q. Excluding other possibilities, would you then have an opinion as to whether this would precipitate the

death? A. I cannot answer that question a direct 'yes' or 'no', as I stated it is possible that these circumstances brought about his death; as to having a definite opinion 'yes' or 'no', I cannot state categorically.

"Q. It could happen? A. Yes, sir, it could happen."

(Cross Examination)

"Q. Under the same circumstances do you have an opinion that the collapse and death could have been caused from any number of other things? A. It is possible, yes, sir.

"*      *      *      *      *      *

"Q. If the collapse and death of Mr. Teal was brought about by a cardiac condition as given you under the hypothetical statement of facts, is it your opinion that such condition and collapse could be brought about or would not have been brought about by a disease? A. As I answered previously, it is a combination of conditions including a disease process. In other words, a normal individual, one free, shall we say, of heart disease, his life would not be jeopardized by this set of circumstances, but the combination of heart disease and these circumstances could be fatal.

"Q. Where there is an underlying condition are there not many, many circumstances where a collapse and death could occur? A. Yes, sir.

"Q. What are some of these? A. Practically any condition.

"Q. Even in sleep? A. Yes, sir.

"Q. While sitting in a chair? A. Yes, sir.

"Q. Following the eating of a normal meal? A. Yes, sir.

"Q. And any one of a thousand other situations? A. Yes, sir.

"Q. During which the final physical change as the result of this disease would result in death? A. It is possible, yes, sir.

"Q. Under any of these circumstances? A. Yes, sir."

(Redirect Examination)

"Q. The other possibilities, I believe you stated, would be where you had an underlying heart disease? A. That is right.

"Q. I will ask you whether or not the age of a person has a great deal to do with his ability to stand strain on the heart and cardio vascular system? A. I am sure it does."

Vaughn Hayes, on rebuttal, a refinery helper who worked on the shift with Teal the day he died.

"Q. What about the air there, is there fresh air coming up there and going out around this bin? A. Maybe some.

"Q. You say there may be some; would you explain how there could be some, or where it comes from and

432

where it goes to? A. Well, maybe some air coming up down below there from some of those doors and openings down through there.

"Q. Are there any fans there? A. Not that I remember.

"Q. This roof is about how high from where you work there? A. You mean from the platform here?

"Q. Yes, sir. A. It would be several feet * * *

"Q. Can you estimate how many feet? A. I imagine about maybe ten or twelve feet to the top."