492 P.2d 1000

**CARTER FARMS COMPANY, a partnership composed of Albert E. Carter, et al., Plaintiffs-Appellants,**

**v.**

**HOFFMAN–LAROCHE, INC., Defendant-Appellee.**

**No. 718.**

Court of Appeals of New Mexico.

Dec. 17, 1971.

Milford D. Estill, Walker & Estill, Carlsbad, for plaintiffs-appellants.

Lowell Stout, Hobbs, for defendant-appellee.

## OPINION

WOOD, Chief Judge.

In this products liability case, we are not concerned with plaintiffs' theories of liability. The issue is whether there was sufficient evidence that the product was defective and that the product was the proximate cause of plaintiffs' damages. The trial court ruled the evidence was insufficient for submission of the case to the jury and directed a verdict for defendant at the close of plaintiffs' case. Plaintiffs appeal.

The product is "Injacom ADE," a solution for the prevention and correction of certain vitamin deficiencies in cattle, sheep and swine. It is sold to licensed veterinarians. A letter to veterinarian Dr. John Abbott states: "The use of Injacom is characterized by an absence of side effects. Abscesses, necrosis, or pooling under the hide are not to be expected with Injacom ADE."

In the fall of 1966, plaintiff, Albert Carter, purchased over 5000 lambs under one year of age. These "feeders" were to be fattened and sold.

As Carter received the lambs, they were each sheared and given two injections. One was a subcutaneous injection in the neck and was a vaccine to control overeating. The other injection was in the "meaty area of the hip" and was Injacom ADE purchased from the veterinarian. The same method was used in making both injections. No adverse consequence from the neck injection is shown or claimed.

The plaintiff testified that: ". . . The next day, it was quite evident that something was wrong. We had, oh, I can't recall the exact number now, something in the area of four or five hundred sheep [the lambs purchased] that were injected the previous day and we had an abnormal number of stiff legs and soreness in those sheep." Nevertheless, the injections continued; all the lambs were injected with Injacom ADE within two days to one week after they were purchased and unloaded.

The stiff legs and soreness observed on the day following injection of the first five hundred was thought to result from the ". . . size needle that they recommended, . . ." A smaller needle was thereafter used and ". . . we had felt that our problem was solved, . . ." because except for the "first ones" no "affects" were noticed subsequent to the Injacom ADE injection.

However, 192 head died within three weeks after being injected with Injacom. The majority of the deaths ". . . were the first ones that were vaccinated;" that is, out of the first five hundred. As to the death losses, ". . . abscess-

es had formed in the legs at the point of injection and the leg literally rotted off the animal." In addition, 40% of the first 1000 lambs marketed were discovered to have abscesses at the point of injection. Other lambs marketed also had abscesses, but the number of lambs affected was a lesser percentage amount.

Over 100 bottles of the Injacom ADE were used. This vaccine had two different serial numbers, meaning "there were two batches of the material." One of the batches caused no apparent trouble. There is no evidence identifying the serial number of the vaccine used on the first lot of lambs which received the vaccine.

The pathologist who tested residue of the vaccine found in some of the bottles was of the opinion that the residue was sterile, but did not relate this residue to the different serial numbers of the vaccine. There is no evidence correlating the vaccine tested to the lambs that received that vaccine. The pathologist examined tissue from animals used for testing purposes and stated that the tissue samples contained abscesses caused by a bacteria. His opinion was that the abscesses were due to a growth of bacteria within the tissue. His opinion as to the cause or source of the bacteria is admittedly speculative.

Carter was an experienced sheep man, having been in the business fifteen years. He had purchased sheep from the same sellers from whom he purchased the lambs in the fall of 1966 and "had no trouble with them." At the time of the fall 1966 purchases he checked the sheep and there was no ". . . visual evidence of any bad health on the part of the sheep."

The veterinarian testified that it was a reasonable medical probability that an abscess would develop and a leg rot off within two weeks after the leg had been injected; that it was not possible for malignant edema or blackleg to be involved; that it was "[n]ot a very good possibility at all" that the feeders (the lambs that were purchased) may have been diseased; that the

existence of organisms (bacteria) on the skin of the sheep before they were purchased would be a "[v]ery faint" explanation; that it isn't very probable that the sheep that died were weaker than the ones that did not die. Asked if he had any proof that the product was defective, the veterinarian answered, "I have no proof except visual aid."

None of the foregoing is direct evidence that the Injacom was defective or that it caused plaintiffs' damages. However, it is not necessary that proof as to these items be shown by direct evidence; proof may be by circumstantial evidence alone. Clower v. Grossman, 55 N.M. 546, 237 P.2d 353 (1951). ". . . Circumstantial evidence consists of proof of facts or circumstances which give rise to a reasonable inference of the truth of the fact sought to be proved." N.M. U.J.I. 17.6.

The requirement upon plaintiffs under the circumstantial evidence rule in this civil case ". . . is that the facts and circumstances . . . together with the inferences that may be legitimately drawn therefrom, shall indicate with reasonable certainty . . ." that the product was defective and the defective product caused plaintiffs' damages. Brown v. Globe Laboratories, 165 Neb. 138, 84 N.W.2d 151 (1957). ". . . It is a matter of probabilities in the light of all the evidence. . . ." O. M. Franklin Serum Company v. C. A. Hoover & Son, 410 S.W.2d 272 (Tex.Civ.App. 1967). See Clower v. Grossman, supra.

Plaintiffs' evidence is that lambs in good health prior to the injection developed abscesses at the point of injection; that the time of the deaths after the injection was medically probable; that the deaths were not due to weakness in the animals; that disease or the existence of bacteria on the skin of the animals were not probabilities. There is evidence that the method of injection did not cause the abscesses.

Two separate inferences that the jury could draw with reasonable certainty from the circumstantial evidence are: that the Injacom ADE contained the bacteria which caused the abscesses and that the Injacom ADE caused plaintiffs' damages. The following decisions support this result: Haberer v. Moorman Mfg. Co., 341 Ill. App. 521, 94 N.E.2d 611 (1950); Brown v. Globe Laboratories, supra; C. A. Hoover and Son v. O. M. Franklin Serum Company, 444 S.W.2d 596 (Tex.1969); O. M. Franklin Serum Company v. C. A. Hoover & Son, supra. Compare Teal v. Potash Company of America, 60 N.M. 409, 292 P. 2d 99 (1956); Reid v. Brown, 56 N.M. 65, 240 P.2d 213 (1952); Clower v. Grossman, supra.

The foregoing answers defendant's claim that no inference could be drawn that its product was defective and that the defective product caused the damages. See Adamson v. Highland Corporation, 80 N.M. 4, 450 P.2d 442 (Ct.App.1969).

■■ Defendant also contends that the evidence outlined above does not take into account all the evidence that was introduced. Defendant emphasizes evidence indicating no product defect and no proximate cause. It apparently would have us weigh the evidence. This argument overlooks the fact that the trial court directed a verdict. That more than one inference was available from all the evidence did not entitle defendant to a directed verdict. Under the evidence, the jury could have found that it was more probable than not that the product was defective and the defective product caused plaintiffs' damages. Benjamin v. Hot Shoppes, Inc., 185 A.2d 512 (D.C.Mun.App.1962). Further, where there is a directed verdict, the evidence and inferences most favorable to the party resisting the motion are to be considered and conflicting evidence unfavorable to the resisting party is to be ignored. Archuleta v. Johnston (Ct.App), 83 N.M. 380, 492 P.2d 997, decided November 5, 1971; Brown v. Hall, 80 N.M. 556, 458 P.2d 808 (Ct.App.1969).

■ Defendant also asserts that the evidence is equally consistent with two hypotheses, therefore, it did not tend to prove a defect or causation. See Stambaugh v. Hayes, 44 N.M. 443, 103 P.2d 640 (1940). The answer is that the circumstantial evidence tended to prove a defect and causation to a reasonable certainty; therefore, we cannot say as a matter of law that the evidence was equally consistent with two hypotheses.

The directed verdict was erroneous and is reversed.

It is so ordered.

HENDLEY and SUTIN, JJ., concur.